UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GARY FRIEDRICH ENTERPRISES, LLC, *et al.*,

        Plaintiffs,

    - against -

MARVEL ENTERPRISES, INC., *et al.*,

        Defendants.

08-cv-01533 (BSJ)(JCF)

---

## DECLARATION OF WALTER ELIOT BARD

Walter Eliot Bard hereby declares pursuant to 28 U.S.C. § 1746 as follows:

1.    I am Vice President, Deputy General Counsel of Marvel Entertainment, LLC and submit this declaration in support of the motion for summary judgment by defendants Marvel Entertainment, LLC, successor by merger to Marvel Entertainment, Inc., formerly known and also sued herein as Marvel Enterprises, Inc. ("Marvel Entertainment"), Marvel Studios, Inc. ("Marvel Studios"), Marvel Characters, Inc. (Marvel Characters"), Marvel Characters B.V. ("Marvel B.V.", Marvel Worldwide, Inc., formerly known as Marvel Publishing, Inc. ("Marvel Worldwide"), Marvel International Character Holdings, LLC, sued herein as Marvel International Holdings, Inc. ("MICH"), MVL International C.V. ("C.V."), Hasbro, Inc. ("Hasbro"), Take-Two Interactive Software, Inc. ("Take Two"), Columbia Pictures Industries, Inc., also incorrectly sued herein as Columbia Tri-Star Motion Picture Group, "Columbia"), Crystal Sky LLC ("Crystal Sky"), Relativity Media, LLC ("Relativity Media"), Michael De Luca Productions, Inc. ("De Luca"), and Sony Pictures Entertainment Inc. ("SPE" and together with all of the foregoing defendants, "Defendants"). The facts set forth in this declaration are based

N-133168_9.DOC

upon my personal knowledge and review of records maintained by Marvel Entertainment, LLC and its subsidiaries.

2. The Marvel companies that are defendants in this lawsuit and their predecessors-in-interest including Amazing Detective Cases Corp., Americas Magman Sales Corp., Animated Timely Features, Inc., Animirth Comics, Inc., Atlas Magazines, Inc., Atlas News Co., Inc., Bard Publishing Corp., Bilbara Publishing Co., Inc., Brief Digest Corp., Britan Publishing Corp., Broadcast Features Publications, Inc., Canam Publishers Sales Corp., Chipiden Publishing Corp., Chistiana Publishing Corp., Classic Detective Stories, Inc., Classic Syndicate, Inc., Comedy Publications, Inc., Comic Combine Corp., Commonwealth Publishing Corp., Complete Photo Story Corp., Cornell Publishing Corp., Crime Bureau Stores, Inc., Crime Files, Inc., Current Detective Stories, Inc., Daring Comics Inc., Emgee Publications, Inc., Empire State Consolidated Adv. Corp., Euclid Publishing Co., Inc., Eye Publishing Corp., Fantasy Comics, Inc., Feature Story Corp., Foto Parade, Inc., Gem Publications, Inc., Hercules Publishing Co., H-K Publications, Inc., International Magazine Sales, Interstate Publishing Co., Jayfee Publications, Inc., Jeangood Publishing Corp., Jest Publishing Co., Inc., Leading Comic Corp., Leading Magazine Corp., Lion Books, Inc., Magazine Management Co., Inc., Magman Export Corp., Male Publishing Corp., Manvis Publications, Inc., Margood Publishing Corp., Marjean Magazine Corp., Marjean TV Enterprises, Marvel Comics Group, Marvel Comics, Inc., Medalion Publishing Corp., Miss America Publishing Corp., Mohawk Publishing Corp., Mutual Magazine Corp., Newsstand Publications, Inc., Non Pareil Publishing Corp., Official Magazine Corp., Olympia Publications, Inc., Olympus Publishing Corp., Postal Publications, Inc., Prime Publications, Inc., Red Circle Magazines, Inc., Revere Publishing Corp., Select Publications Inc., Snap Publishing Co., Inc., Sphere Publications, Inc., Sports Action, Inc., Stag Publishing Corp.,

Timely Comics, Inc., Timely Publications, Tip Top Publications, Inc., 20th Century Comic Magazine Corp., 20th Century Comics Corp., Universal Crime Stories, Inc., U.S.A. Comic Magazine Corp., Transcontinental Publishing Corp., Vista Publications, Inc., Walden Publishing Co., Inc., Warwick Publications, Inc., Western Fiction Pub. Co. Inc., Young Allies, Inc., Zenith Books, Inc., Zenith Publishing Corporation and Zest Publishing Co., Inc., Martin Goodman, Jean Goodman, Perfect Film & Chemical Corporation, Cadence Industries Corporation and Marvel Entertainment Group, Inc. (collectively, "Marvel") have been in the business of publishing comic books since the late 1930s.

3. Marvel's Ghost Rider character has appeared in comic books in different incarnations since 1966.

4. In 1966, Friedrich was engaged by Marvel to write a comic book series based on an existing western cowboy hero on horseback named Ghost Rider. The series ultimately consisted of seven issues with cover dates from February 1967 through November 1967 which were published in a comic book series entitled *The Ghost Rider*. Copies of the cover and indicia pages of the first issue of the Ghost Rider series are annexed hereto as Exhibit 1.[1]

5. The comic book that is the subject of this action, *Marvel Spotlight*, Vol. 1, No. 5 (the "Work") was first published by Marvel in April 1972.[2] The Work contained a copyright notice in the name of Magazine Management Co., Inc., Marvel Comics Group. A copy of the Work is annexed hereto as Exhibit 2.

6. The cover date of the Work was August 1972. The publication date of a Marvel comic book is typically approximately four months before the printed cover date.

---

[1] For ease of reference, an index of exhibits referred to herein is annexed hereto as Exhibit 98.
[2] *Marvel Spotlight* was an ongoing title Marvel used to try out new stories and characters to see whether they merited their own titles.

7. The Work embodied creative contributions of several individuals in addition to Friedrich, including Mike Ploog ("Ploog") as pencil artist and inker and Roy Thomas ("Thomas") and Stan Lee ("Lee") as editors.[3]

8. None of the creative contributors to the Work were entitled to payment based on the financial success of the Work or any characters created in the Work and neither Friedrich, Ploog nor any of the other creative contributors to the Work ever received compensation resulting from Marvel's exploitation of the Work in merchandise, video games, or movies. All creative contributors to Marvel Comics did, however, receive "reprint incentives" when a comic book was reprinted pursuant to a unilateral practice instituted by Marvel in or around 1976. Reprint incentives are voluntary, non-negotiable payments having nothing to do with the creation of new characters or the profitability of a publication. For example, Friedrich received reprint incentives for *Essential Ghost Rider* Vol. 1 (2005), which was a reprint of *Marvel Spotlight* No. 5. Friedrich did not, however, receive reprint incentives for any Ghost Rider work he did not write.

9. The featured characters in the Work, including Ghost Rider, appeared in six more issues (Nos. 6 through 11) of *Marvel Spotlight*, Vol. 1, all of which were registered for copyright in the name of Magazine Management Co., Inc., Marvel Comics Group.

10. After the publication of the last Ghost Rider story to be published in *Marvel Spotlight*, Vol. 1, *viz.*, No. 11, the Marvel Comics Group division of Cadence Industries Corporation ("Cadence") began publishing Ghost Rider stories in its own title, *Ghost Rider*, the first issue of which, Vol. 1, No. 1, bore a cover date of September 1973. This series ultimately consisted of 81 issues with the last cover date of Vol. 1, No. 81 being June 1983.

---

[3] Often the person engaged to apply ink to the comic book illustrations (known as the "inker") was someone other than the pencil artist, but in this case, Ploog both created the art and applied ink to the drawings.

11. In October 1974, Marvel published *Ghost Rider*, Vol. 1, No. 10. (cover date February 1975), which contained a version of the Work substantially, but not entirely, identical to the original version first published in April 1972. Marvel also published subsequent reprints which contained nearly identical versions of the Work in *The Original Ghost Rider I* (1992); *Ghost Rider: Highway to Hell 1* (2001); *Essential Ghost*, Vol. 1 (2005); and *Marvel Milestones: Ghost Rider, Black Widow, Iceman 1* (2005).

12. From in or about 1990 through 1998, Marvel published another series of comic books, *Ghost Rider*, Vol. 2, Nos. 1-93, featuring an incarnation of the Ghost Rider character with an alter ego (Danny Ketch) and ancillary characters different than the version appearing in the Work.

13. In 2001 Marvel began publishing *Ghost Rider,* Vol. 3, which featured the incarnation of Ghost Rider (and his Johnny Blaze alter ego) embodied in the Work. *Ghost Rider,* Vol. 3 comprised six issues, Nos. 1-6, with cover dates from August 2001 through January 2002.

14. Marvel has published approximately 300 comic book stories featuring the motorcycle-riding Ghost Rider character and other elements of the Work.

15. From April 1972, when the Work was published, through in or about 1978, Friedrich wrote roughly 100 comic books published by Marvel, including approximately six *Ghost Rider* titles. Writers other than Friedrich were also assigned to write *Ghost Rider* stories during this period.

16. Based on its belief that it has at all times owned and continues to own the copyright in and to the Work, for the last fifteen years or so, Marvel has published comic books featuring elements of the Work and granted licenses of the right to exploit the Work through the creation, manufacture and sale of toys and other merchandise and video games.

17. Marvel began developing and marketing toys featuring the Ghost Rider character at least as early as 1995 through an exclusive license with Toy Biz, Inc., then a partially owned subsidiary of Marvel Entertainment Group, Inc.

18. Video games including the Ghost Rider character were also developed by various third-party licensees as early as 1995. Ghost Rider appeared as a supporting character in the 1995 video game *Venom/Spider-Man: Separation Anxiety*; made a cameo appearance in the 2000 *Spider-Man* Activision game; made appearances in *Marvel Super Heroes vs. Street Fighter* (1997) and *Marvel: Ultimate Alliance* (2006); and was featured in a game called *Ghost Rider* based on the Ghost Rider movie (2007).

19. Marvel also licensed the right to manufacture and sell numerous categories of Ghost Rider-related merchandise, including figurines, gifts and collectibles, accessories, stationery and paper goods, post cards, card games, calendars, clothing and accessories between 1999 and 2003.

20. On May 15, 2000, Marvel Characters entered into a license agreement with Crystal Sky pursuant to which Crystal Sky was granted the right to develop, produce, distribute, advertise and publicize a live action feature-length theatrical motion picture based on the Work. On April 26, 2002, Crystal Sky assigned the rights to develop the Ghost Rider movie to Columbia.

21. Principal photography for the Ghost Rider movie commenced on February 14, 2005, and although it was originally scheduled for release on August 4, 2006, the movie was not actually released until February 16, 2007.

22. Marvel first learned that Friedrich might be claiming an ownership interest in the Work in April 2004 after receiving a copy of a letter dated April 6, 2004 from Friedrich's

former attorney, Arthur Aaronson ("Aaronson"), sent to Jared Jussim of SPE. A copy of the April 6, 2004 letter is annexed hereto as Exhibit 3.

23. By a letter dated April 14, 2004, a copy of which is annexed hereto as Exhibit 4, I responded to Aaronson's April 6, 2004 letter on Marvel's behalf stating in part: "Marvel's position is that Ghost Rider was created as work for hire under the copyright laws and that Marvel is the owner of all right, title and interest in the copyright and trademark." After the April 14, 2004 letter, I exchanged several letters with Aaronson concerning Ghost Rider. At no time during the course of that exchange of correspondence did Marvel alter its position that the Work was created for hire and owned exclusively by Marvel.

24. Marvel had been publishing comic books featuring the Work and exploiting the Work through license agreements with third parties for about 35 years before Friedrich and plaintiff Gary Friedrich Enterprises, LLC ("GFE" and together with Friedrich, "Plaintiffs") commenced this action on April 4, 2007.

25. Plaintiffs' delay in asserting their claim has caused significant prejudice to Defendants, which has been recognized by Friedrich. During the 1971-72 time period when the Work was created and published, Marvel's practice was to place a legend on the reverse side of all checks used to pay the individuals who made creative contributions to Marvel comic books. By endorsing the check under the legend, the payee acknowledged that the rights in and to the work for which payment was being made belonged to Marvel. Friedrich, Ploog, Thomas and Lee each testified to this practice. Friedrich Tr. 142:2-143:5; Ploog Tr. 32:21-33:9; Thomas Tr. 354:12-355:23; Lee Tr. 40:21-41:-13.[4] Friedrich was well aware of the potential prejudice Marvel could face without copies of the checks used to pay him and admitted to Thomas in an

---

[4] Copies of the excerpts of deposition testimony of Friedrich, Ploog, Thomas and Lee cited in this declaration or Defendants Local Rule 56.1 are annexed hereto as Exhibits 5, 6, 7, and 8, respectively.

email dated June 14, 2006 that these checks did exist, discussing a possible lawsuit against Marvel: "Also, they don't have any of the signed checks any more, which may help." A copy of the June 14, 2006 e-mail is annexed hereto as Exhibit 9.

26. Since publication of the Work in 1972, Marvel and the other Defendants have made significant investments in exploiting the Work in comic books, merchandise, video games and in two live action motion pictures, based on their understanding that Marvel was the rightful owner of the copyright in and to the Work. Marvel entered into numerous license agreements with third-parties and promoted the Work, which it would not have done if Friedrich had commenced an action claiming copyright ownership.

27. A copy of the amended complaint in this action filed on March 28, 2011 is annexed hereto as Exhibit 10.

28. A copy of an excerpt from *The Overstreet Comic Book Price Guide* (40th ed.) reflecting, *inter alia*, publication information for *The Ghost Rider, Marvel Spotlight,* Vol. 1, and *Ghost Rider,* Vols. 1, 2 and 3 is annexed hereto as Exhibit 11.

29. A copy of Certificate of Registration No. RE931-110 for *Marvel Spotlight,* Vol. 1, No. 5 published in April 1972 is annexed hereto as Exhibit 12.

30. A copy of Certificate of Registration No. B767424 for *Marvel Spotlight*, Vol. 1, No. 6 published in June 1972 containing various elements of the Work is annexed hereto as Exhibit 13.

31. A copy of Certificate of Registration No. B846936 for *Ghost Rider*, Vol. 1, No. 1 published in May 1973 containing various elements of the Work is annexed hereto as Exhibit 14.

32. A copy of Certificate of Registration No. B978712 for *Ghost Rider*, Vol. 1, No. 10 published in February 1975 containing a reprint of the Work is annexed hereto as Exhibit 15.

33. A copy of the certificate of trademark registration for GHOST RIDER publications dated July 20, 1976 is annexed hereto as Exhibit 16.

34. A copy of the certificate of trademark registration for GHOST RIDER toys, games and playthings dated July 29, 1997 is annexed hereto as Exhibit 17.

35. A copy of the certificate of trademark registration for GHOST RIDER prerecorded videotapes and DVDs featuring live action motion pictures, video game software and other video products dated December 18, 2007 is annexed hereto as Exhibit 18.

36. A copy of an agreement dated June 28, 1968 between Martin and Jean Goodman and Perfect Film & Chemical Corporation is annexed hereto as Exhibit 19.

37. A copy of a December 7, 1978 acknowledgement of assignment from Martin and Jean Goodman and their affiliates to Cadence is annexed hereto as Exhibit 20.

38. A copy of the December 31, 1968 assignment from Perfect Film and Chemical Corporation to Magazine Management Co., Inc. ("Magazine Management") is annexed hereto as Exhibit 21.

39. A copy of the January 1, 1972 assignment from Magazine Management to Cadence is annexed hereto as Exhibit 22.

40. A copy of the December 29, 1986 assignment from Cadence to Marvel Entertainment Group, Inc. is annexed hereto as Exhibit 23.

41. A copy of the August 27, 1992 certificate of ownership and merger (filed on August 31, 1992) whereby Magazine Management merged with and into Marvel Entertainment Group, Inc. is annexed hereto as Exhibit 24.

42. A copy of the September 1, 1995 assignment from Marvel Entertainment Group, Inc. to Marvel Characters is annexed hereto as Exhibit 25. At all times since September 1, 1995, Marvel Characters has been the owner of the copyright in and to the Work.

43. A copy of the Copyright Report prepared by Thomson & Thomson dated March 11, 2002 is annexed hereto as Exhibit 26.

44. A copy of the July 31, 1978 agreement between Marvel and Friedrich is annexed hereto as Exhibit 27.

45. A copy of excerpts from the 1995 Toy Biz, Inc. catalog is annexed hereto as Exhibit 28.

46. A copy of excerpts from the 1996 Toy Biz, Inc. catalog is annexed hereto as Exhibit 29.

47. A copy of excerpts from the 2003 Toy Biz, Inc. catalog is annexed hereto as Exhibit 30.

48. A copy of excerpts from the 2004 Toy Biz, Inc. catalog is annexed hereto as Exhibit 31.

49. A copy of the February 23, 1995 Toy Biz, Inc. prospectus is annexed hereto as Exhibit 32.

50. A copy of an article published by *PR Newswire* dated July 25, 1995 is annexed hereto as Exhibit 33.

51. A copy of an article published by *PR Newswire* dated October 24, 1995 is annexed hereto as Exhibit 34.

52. A copy of an article published by *M2 Communications* dated January 19, 1996 is annexed hereto as Exhibit 35.

53. A copy of an article published by *PR Newswire* dated February 7, 1996 is annexed hereto as Exhibit 36.

54. A copy of excerpts from Toy Biz, Inc.'s 1996 Annual Report is annexed hereto as Exhibit 37.

55. A copy of excerpts from Toy Biz, Inc.'s 1997 Annual Report is annexed hereto as Exhibit 38.

56. A copy of an article published by *The Chicago Tribune* dated October 8, 1989 is annexed hereto as Exhibit 39.

57. A copy of an article published by *The New York Times* dated October 18, 1992 is annexed hereto as Exhibit 40.

58. A copy of an article published by *Variety* dated May 17, 2000 is annexed hereto as Exhibit 41.

59. A copy of an article published by *Business Wire* dated May 18, 2000 is annexed hereto as Exhibit 42.

60. A copy of an article published by *The Cleveland Plain Dealer* dated May 20, 2000 is annexed hereto as Exhibit 43.

61. A copy of an article published by *Newshouse News Service* dated May 22, 2000 is annexed hereto as Exhibit 44.

62. A copy of an article published by *The Star Ledger* dated May 25, 2000 is annexed hereto as Exhibit 45.

63. A copy of an article published by *The San Diego Union-Tribune* dated July 9, 2000 is annexed hereto as Exhibit 46.

64. A copy of an article published by *Newsday* dated July 12, 2000 is annexed hereto as Exhibit 47.

65. A copy of an article published by *The Philadelphia Inquirer* dated July 16, 2000 is annexed hereto as Exhibit 48.

66. A copy of an article published by *The Dallas Morning News* dated July 16, 2000 is annexed hereto as Exhibit 49.

67. A copy of an article published by *Variety* dated August 29, 2000 is annexed hereto as Exhibit 50.

68. A copy of an article published by *Variety* dated September 4, 2000 is annexed hereto as Exhibit 51.

69. A copy of an article published by *The Toronto Sun* dated April 27, 2001 is annexed hereto as Exhibit 52.

70. A copy of an article published by *Screen International* dated May 9, 2001 is annexed hereto as Exhibit 53.

71. A copy of an article published by *The Erie Times* dated June 28, 2001 is annexed hereto as Exhibit 54.

72. A copy of an article published by *The Los Angeles Times* dated July 10, 2001 is annexed hereto as Exhibit 55.

73. A copy of an article published by *The Columbia Dispatch* dated July 31, 2001 is annexed hereto as Exhibit 56.

74. A copy of an article published by *Film Journal International* dated August 1, 2001 is annexed hereto as Exhibit 57.

75. A copy of an article published by *Variety* dated August 13, 2001 is annexed hereto as Exhibit 58.

76. A copy of an article published by the *Hollywood Reporter* dated August 31, 2001 is annexed hereto as Exhibit 59.

77. A copy of an article published by the *Hollywood Reporter* dated October 25, 2001 is annexed hereto as Exhibit 60.

78. A copy of an article published by *USA Today* dated April 26, 2002 is annexed hereto as Exhibit 61.

79. A copy of an article published by *The Houston Chronicle* dated April 28, 2002 is annexed hereto as Exhibit 62.

80. A copy of an article published by the *Hollywood Reporter* dated May 2, 2002 is annexed hereto as Exhibit 63.

81. A copy of an article published by *The San Diego Union-Tribune* dated May 5, 2002 is annexed hereto as Exhibit 64.

82. A copy of an article published by *Variety* dated May 21, 2002 is annexed hereto as Exhibit 65.

83. A copy of an article published by the *Hollywood Reporter* dated May 22, 2002 is annexed hereto as Exhibit 66.

84. A copy of an article published by *The Milwaukee Journal Sentinel* dated May 24, 2002 is annexed hereto as Exhibit 67.

85. A copy of an article published by the *Hollywood Reporter* dated June 17, 2002 is annexed hereto as Exhibit 68.

86. A copy of an article published by *The New York Times* dated September 11, 2002 is annexed hereto as Exhibit 69.

87. A copy of an article published by the *Hollywood Reporter* dated November 5, 2002 is annexed hereto as Exhibit 70.

88. A copy of an article published by *The Los Angeles Times* dated February 10, 2003 is annexed hereto as Exhibit 71.

89. A copy of an article published by *Newsday* dated February 23, 2003 is annexed hereto as Exhibit 72.

90. A copy of an article published by the *Hollywood Reporter* dated April 9, 2003 is annexed hereto as Exhibit 73.

91. A copy of an article published by *The Philadelphia Daily News* dated April 10, 2003 is annexed hereto as Exhibit 74.

92. A copy of an article published by *Film Journal International* dated May 1, 2003 is annexed hereto as Exhibit 75.

93. A copy of an article published by *The New York Times* dated May 18, 2003 is annexed hereto as Exhibit 76.

94. A copy of an article published by the *Hollywood Reporter* dated May 28, 2003 is annexed hereto as Exhibit 77.

95. A copy of an article published by *The Hartford Courant* dated June 15, 2003 is annexed hereto as Exhibit 78.

96. A copy of an article published by *The Orlando Sentinel* dated June 22, 2003 is annexed hereto as Exhibit 79.

97. A copy of an article published by *The Buffalo News* dated June 22, 2003 is annexed hereto as Exhibit 80.

98. A copy of an article published by *The Pittsburgh Post-Gazette* dated July 1, 2003 is annexed hereto as Exhibit 81.

99. A copy of an article published by the *Hollywood Reporter* dated August 12, 2003 is annexed hereto as Exhibit 82.

100. A copy of an article published by *The Los Angeles Times* dated August 31, 2003 is annexed hereto as Exhibit 83.

101. A copy of an article published by *The Orlando Sentinel* dated September 7, 2003 is annexed hereto as Exhibit 84.

102. A copy of an article published by the *Hollywood Reporter* dated October 10, 2003 is annexed hereto as Exhibit 85.

103. A copy of an article published by *The Chicago Tribune* dated November 21, 2003 is annexed hereto as Exhibit 86.

104. A copy of an article published by *The Chicago Tribune* dated November 25, 2003 is annexed hereto as Exhibit 87.

105. A copy of an article published by the *Hollywood Reporter* dated March 3, 2004 is annexed hereto as Exhibit 88.

106. A copy of an article published by *Business Wire* dated March 11, 2004 is annexed hereto as Exhibit 89.

107. A copy of an excerpt from a Marvel report filed with the Securities Exchange Commission dated December 31, 2002 is annexed hereto as Exhibit 90.

108. A copy of an excerpt from a Marvel report filed with the Securities Exchange Commission dated August 12, 2003 is annexed hereto as Exhibit 91.

109. A copy of an excerpt from a Marvel report filed with the Securities Exchange Commission dated November 4, 2003 is annexed hereto as Exhibit 92.

110. A copy of an excerpt from a Marvel report filed with the Securities Exchange Commission dated December 31, 2003 is annexed hereto as Exhibit 93.

111. A copy of an excerpt from a Marvel report filed with the Securities Exchange Commission dated March 2, 2004 is annexed hereto as Exhibit 94.

112. A copy of excerpts from the Aaronson deposition conducted on May 2, 2011 that are cited in the accompanying memorandum of law in support of Defendants' motion for summary judgment and Local Rule 56.1 statement is annexed hereto as Exhibit 95.

113. A copy of my letter to Aaronson dated June 17, 2004 is annexed hereto as Exhibit 96.

114. A copy of the docket sheet in the above-captioned action is annexed hereto as Exhibit 97.

115. An index of the exhibits referred to in this declaration is annexed hereto as Exhibit 98.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 17, 2011.

_____
Walter Eliot Bard

N-133168_9.DOC