UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GARY FRIEDRICH ENTERPRISES, LLC, et al.,

                    Plaintiffs,

-against-

MARVEL ENTERPRISES, et al.,

                    Defendants.

08-CV-01533 (BSJ)(JEF)

---

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1 IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.1 of the Local Rules of the United States District Court for the Southern District of New York, Plaintiffs Gary Friedrich ("Friedrich") and Gary Friedrich Enterprises, LLC ("GFE") (collectively hereafter, "Plaintiffs") submit the following Statement of Material Facts as to which there is no genuine issue to be tried in support of their Motion for Summary Judgment:

1.      Gary Friedrich ("Friedrich") was born in Jackson, Missouri on August 21, 1943. Declaration of Gary Friedrich dated October 17, 2011 ("GF Decl.") ¶ 2; April 1, 2011 Deposition of Gary Friedrich ("GF Dep.") annexed as Ex. 1 to the Declaration of Charles Kramer ("Kramer Decl.") at 8:20-21.

2.      Friedrich graduated from Jackson High School in 1961.  Id., 8:22-9:2.

3.      Friedrich is a resident of Arnold, Missouri, along with his wife Jean and family. GF Decl. ¶ 3.

4.      At a very young age, Friedrich was introduced to comic books and even learned to read from his father reading comic books to him at an early age, in addition to becoming enamored with the characters themselves.  GF Decl. ¶ 4.

5.      As a young boy, Friedrich began to become enamored with motorcycle riding gang movies, saw the movie called "The Wild One" starring Marlon Brando in 1953 and fell in love with the cool motorcycle rider it presented and motorcycles in general.  GF Dep. 74:20-75:5; GF Decl. ¶ 5.

6.      At the time, Friedrich was a reader of comic books and seeing "The Wild One" and other motorcycle movies put the initial idea of a motorcycle riding hero in his mind.  GF Decl. ¶ 5.

7.      After graduating high school, Friedrich worked for a local record store for approximately 3 years, and then became managing editor of the Jackson Pioneer Newspaper where he was influenced to write from his mentor, Tom Stites.  GF Decl. ¶ 6.

8.      While a teenager and young man, Friedrich continued to watch motorcycle gang films starring the likes of Jack Nicholson, Dennis Hopper and Peter Fonda and believed the black leathers of the motorcycle clubs and gangs that were pictured (and were sprouting up in his home town) had a sense of cool power.  GF Decl., ¶ 7.

9.      It was for that reason that Friedrich ultimately chose black leather to be the wardrobe for the character he was creating and eventually put into Marvel Spotlight, Vol. 1, No. 5 ("Spotlight 5).  GF Decl., ¶ 8.

10.     Later on, in the mid to late 1960's, Evel Knievel and other cycle stunt riders caused Friedrich to evolve his contemplated idea from a mere motor cycle rider into a motorcycle stunt rider, similar to Knievel.  GF Decl. ¶ 16.

11.     After a few various jobs, in 1965 Friedrich decided to move to New York at the suggestion of a high school friend, Roy Thomas, to do work in the comic book industry.  GF Dep. 11:11-16.

12.     In 1965, Friedrich moved to New York City, where he worked at a record store for a few months.  GF Decl. ¶ 9.

13.     Friedrich caught his first break in the comic book industry in early 1966 when the editor of Charlton Comics agreed to pay Friedrich to write romance scripts for Charlton on a freelance basis.  GF Dep. 13:16-14:3; GF Decl. ¶ 10.

14.     Following work on the romance stories, Friedrich then also did some superhero work for Charlton on a script by script basis.  GF Dep. 13:6-14:7.

15.     In writing comic books for Charlton, Friedrich would write a complete script, turn it into the editor and then the artist would take the script and draw from the script.  GF Dep. 14:8-13.

16.     Friedrich then managed to get a part time job working with Topps Chewing Gum, where Friedrich wrote a series of Superman bubble gum cards and handled proofreading and editorial type tasks.  GF Decl. ¶ 10.

17.     In or around September, 1966, Friedrich took a staff job as an assistant editor with a company producing comic books under the "Marvel" name, which he knew as Magazine Management, as an assistant to Stan Lee the company that was then producing comic books under the Marvel name.  GF Dep. 16:15-19, GF Decl. ¶ 11.

18.     The company Friedrich worked for at the time and other companies of common ownership were informally referred to, together, as "Magazine Management", but it was distinct entity from the company formally incorporated as Magazine Management Co, Inc. for which

Friedrich would later work in 1968, which later company was first incorporated in 1968.  See Ex. 43 to Kramer Decl.

19.     Friedrich's responsibilities as an assistant editor for the comic book company in 1966 were to do proofreading, some preliminary editing work on dialogue in comic books in production, all entry level duties, answering fan mail and giving visiting kids tours of the office. GF Decl. ¶ 12; GF Dep. 16:23-17:7; Deposition of Roy Thomas ("RT Dep.) annexed to Kramer Decl. as Ex. 3, 32:16-33:4.

20.     From time to time, in addition to and separate from my job duties, Friedrich was also asked by the senior editor at the company Stan Lee or the other assistant editor Roy Thomas from time to time if he would write an issue of an existing comic book title on a separate free lance, independent contractor basis, which he usually did, deciding on a comic by comic basis. GF Dep. 17; GF Decl. ¶ 13.

21.     Friedrich was always paid by separate check for the free lance projects he agreed to write, separate from and in addition to his salary for his staff position.  GF Decl. ¶ 14; GF Dep. 17:17-21; .

22.     When Friedrich did freelance comic book writing for existing Marvel titles, it was pursuant to a specific request from Stan Lee or other management to write a comic for a specific existing title line, which was work he did after getting the request and agreeing to it and was always paid separate from the staff position, by the page.  GF Dep. 17:12-21; RT Dep. 27:14-22, 45:16-22, pg. 196-198; Deposition of Stan Lee ("Lee Dep.") annexed to Kramer Decl. as Ex. 3, 12:19-13:12.

23.     The freelance work that Friedrich did was almost always done away from the office, including a significant amount of work from California and Missouri.  GF Dep. 26:11-14, 41:3-5, 43:4-17.

24.     During Friedrich's first two years in New York, real life motorcycle jumping daredevil, Evel Knievel, who would use his motorcycle to jump cars, canyons, and other obstacles, rose in popularity.  GF Decl. ¶ 15; GF Dep. 75:4-5.

25.     The influence of Evel Knievel and other stunt riders caused Friedrich to evolve his hero from a mere motorcyclist into a motorcycle stuntman, similar to Knievel.  GF Decl. ¶ 16.

26.     During these years, although far from an everyday project, Friedrich would continue to periodically think about his evolving character and his physical attributes.  GF Decl. ¶ 17.

27.     During the summer of 1968, Friedrich decided to leave his staff position at the comic book company to spend the summer in California with a high school friend by the name of Paul Schade.  GF Dep. 24:18-25:13.

28.     While Friedrich and Schade were living in California, another high school friend of theirs, C.L. Slinkard, decided he would ride out from Missouri to California on his motorcycle to visit.  ; GF Decl. ¶20; Deposition of Paul Schade ("Shade Dep.") annexed to Kramer Decl. as Ex. 4, 17:1-10.

29.     On the evening of the arrival of Slinkard and his pregnant girlfriend, Friedrich and Schade were walking down the street when Slinkard showed up on his motorcycle with his pregnant girlfriend on the back on a Triumph Bonneville 650 with huge ape hangers.  Shade Dep. 17:1-18:25.

30.    Slinkard was about 24 or 25.  Schade Dep. 20:3-8.

31.    Slinkard was about 5'10" and was very thin and wirey with a boney face, with cheeks sucked in and high.  GF Dep. 26:3-6; RT Dep. 331:13-16.

32.    He always seemed to look "like kind of a scarecrow kind of character."  RT Dep. 331:18-20.

33.    Slinkard also had bright, fiery red hair.  RT Dep. 331:16-17; GF Dep. 26:6-7; Shade Dep. 20:9-13.

34.    Friedrich saw Slinkard roaring down the road, his red hair coming out from his boney face, and it instantly clicked that his motor cycle character would have  a skull for a head with flames around and coming out from the skull.  GF Decl. ¶ 21, Schade Dep. 18:5-10, GF Dep. 150:1-17.

35.    Friedrich told Schade that Slinkard's head and boney face looked like a skeleton with his skull on fire and was what Friedrich would have his character look like.  GF Dep. 150:7-13; Schade Dep. 18:5-19:6, 70:8-24.

36.    The idea that his hero would have a flaming skull also caused Friedrich to decide that his motor cycle stuntman would have some connection to satan and hell and would turn from a normal man into a supernatural or demonic being as a flaming skulled version of himself. Throughout 1968 and 1969 Friedrich continued to develop his character and story, deciding the hero would have a love interest and that he would sell his soul to the devil for a noble purpose, and often telling David George, a long time friend of mine, about different aspects and characteristics.  GF Decl. ¶ 22; George Dep. 27:16-28:11; 68:14-23.

37.    At the end of the summer of 1968, Friedrich returned to New York.  GF Decl. ¶ 23.

38.     At that point, his former company had been sold to Perfect Film and Chemical and was a separate subsidiary company of that company formally incorporated as Magazine Management Co., Inc.  Lee Dep. 6:16-22.

39.     Friedrich approached his former bosses, who now worked for the "new" Magazine Management Co., Inc. and attempted to get his staff position back, but it had been filled.  GF Decl. ¶ 23.

40.     After Friedrich returned to New York after the summer of 1968, he continued to write freelance comics for existing titles for Magazine Management from time to time on the same free lance, comic-by-comic, basis.  GF Decl. ¶ 23.

41.     In 1969, Friedrich got married, spent the summer in California, but then again returned to New York.  GF Decl. ¶ 24-25.

42.     Upon Friedrich's return to New York in 1969, David George, a long time friend of Friedrich who was the editor of a men's magazine, hired Friedrich to an assistant position.  GF Decl. ¶ 25; Deposition of David George annexed as Ex. 5 to the Kramer Decl., 59:2-10.

43.     The men's magazines for which Friedrich went to work were published by Magazine Management Co, Inc, the same company that then printed comics under the Marvel name, but had completely separate operations.  GF Dep. 49:8-24.

44.     While at Magazine Management, Friedrich only did editorial work and wrote stories for the men's magazine division and did not have comic book related duties.  GF Decl. ¶ 26.

45.     Prior to even working with the men's magazine division, George recalls Friedrich always talking about his character incessantly, specifically a Ghost Rider character on a

motorcycle with a flaming skull, and how the character would sell his soul to the devil for a noble purpose.  George Dep. 27:15-28:11, 60:23-61:22; GF Decl. ¶ 23; GF Dep. 150:23-151:9.

46.     In the fall of 1970, Friedrich had a disagreement with an individual in upper management, and as a result of writing certain memos to Magazine Management's publisher, Friedrich was let go.  GF Decl. ¶ 27; GF Dep 33:2-7.

47.     Friedrich's termination prevented him from continuing to freelance for the comics division.  Id.

48.     Thereafter, Sol Brodsky, an old friend of Friedrich's with whom Friedrich had discussed  his evolving motorcycle hero character, asked Friedrich if he would write some comics on a freelance basis for Skywald Publications, a comics publication that Brodsky co-owned.  Id. ¶ 28.

49.     Skywald was forming a line of adult comic books and Brodsky recalled Friedrich's motorcycle character from a prior conversation.  Id. ¶ 29.

50.     Ultimately Friedrich held back the complete concept of his superhero character from Skywald because of concern over the publishing set up at Skywald and the quality of the artwork done in the Skywald publications, but given Brodsky's enthusiasm for a motorcycle character, he discussed a different type of motor cycle character with him, along the lines of a purely human vigilante character on a motorcycle.  Id. ¶ 30-31.

51.     Friedrich worked with Sol Brodsky, Hershel Waldman, Ross Audru and Mike Esposito and they jointly created the purely human motorcycle vigilante comic book called "Hell-Rider" and Friedrich retained his idea of a supernatural, stunt jumping, demon character for use at another time.  Id. ¶ 32.

52.     Thereafter, in January or February, 1971, Friedrich learned that Magazine Management wanted somebody to handle its mail, and he was hired for that staff mailroom position.  GF Decl. ¶ 33.

53.     Friedrich's job for Magazine Management was handling mail, which required going through all the fan mail, opening the mail, reading the letters, sorting them out in separate stacks related to each series and then pick out letters which might be suitable for printing in the letter pages of the comics.  In addition, Friedrich would send out little thank you cards to the people who didn't make the comics mail pages and if an editor was going to use mail or the letter that was sent in, then a card would be sent to the writer notifying them that their letter would appear in such and such issue, in such and such book.  GF Decl. ¶ 34; GF Dep. 47-48, RT Dep. 35:23-36:5.

54.     Friedrich was also once again able to write comics for existing titles for Magazine Management on a separate free lance basis and was requested to, and did, do so on the same as requested/as agreed, free lance basis from time to time.  GF Decl. ¶ 35.

55.     In early 1971 the comic's code changed and began to allow more adult oriented content to be included in comic books including demons and supernatural elements that had been previously restricted.  GF Decl. ¶¶ 36-37.

56.     As a result of the change in the CCA, Friedrich decided that it was his time to try and launch his character and origin story as it would now pass the CCA.  Id. ¶¶ 36-38.

57.     At the time of the CCA changes, Friedrich began to focus on the characters and story for the first time with a serious thought that he could publish and sell an actual comic book telling the story.  Just before putting pen to paper, and after rejecting the idea of having his hero sell his soul to the devil to save the love of his life as being too cliché, Friedrich decided instead

that he would sell his soul to save her father.  Friedrich decided that the stuntman would be named Blaze and that he would be an orphan being raised by the father of the girl that he loved, who he would then save.  Friedrich  also decided that Blaze would be somehow following in the footsteps of his adoptive father as a stuntman, and would be physically fit, tall, with blonde hair, and attractive, and an antithesis to the supernatural hellish persona Friedrich  decided would be called Ghost Rider. Id. ¶ 38; GF Dep. 93:10-95:22.

58.     With the look of his hero's human and supernatural personas and the general framework of his story in place, Friedrich, at home, on his own time and at his own expense, sat down and formalized his story and characters in writing.   He created the characters of Blazes deceased father, and the separate father figure he would try to save thru his deal with the devil and fleshed out the story while preparing a detailed written synopsis.  Id. ¶ 39.

59.     When he had completed it, the synopsis provided full descriptions of the storyline, and the Ghost Rider, Johnny Blaze, Barton Blaze, Roxanne Simpson and Crash Simpson characters, as well as key action panels that would be in the comic book itself.  GF Decl. ¶ 40; GF Dep. P. 93-97.

60.     The draft synopsis of Ghost Rider was two to three pages long.  GF Dep. 81:21-23.

61.     Considering Magazine Management's comics division assistant editor, Roy Thomas, to be his friend, Friedrich approached Magazine Management through Thomas, describing his hero, related characters and origin story and presented him with his previously created written synopsis and proposed that MMC publish the comic book that he would write using the new characters and telling the story he had described.  GF Decl. ¶ 45; GF Dep., 77:10-13, 80:24-81:13, 114:7-14.

62.     Thomas agreed it sounded like a viable storyline and characters but indicated a meeting with Stan Lee, who headed up the Marvel division of MMC at the time, would be necessary if Friedrich wanted MMC to publish his book.  GF Decl. ¶ 46; Ex. 20, 21, and 22 to Kramer Decl, Answers to Contention Interrogatories.

63.     Thomas told Friedrich he would give the written synopsis to Lee and would set up a meeting for Friedrich to make his proposal.  GF Decl. ¶ 47.

64.     Lee received the written synopsis from Thomas prior to Friedrich's meeting with Lee.  Id.

65.     Defendants have admitted that Friedrich approached Magazine Management, their alleged predecessor in interest with the idea for a comic book story featuring a motorcycle riding character Ghost Rider/Johnny Blaze, which became Spotlight 5.  Answers to Plaintiffs' Contention Interrogatories, Ex. 20, 21 and 22 to Kramer Decl., pg. 3-5.

66.     At the meeting, Lee listened to Friedrich's description and agreed to go forward with the project that Friedrich initiated, and agreed that Magazine Management would publish the comic book that Friedrich would write.  GF Decl. ¶ 49; GF Dep. Pg. 80-81.

67.     Pursuant to the agreement, Friedrich agreed that he would give Magazine Management the copyrights to the comic book and the right to use the characters in additional comic books as part of the agreement.  Id. ¶ 50.

68.     Friedrich and Lee did not discuss anything other than comic books.  Id.

69.     Friedrich and Lee did not discuss "renewal rights" in the meeting.  Id.

70.     Friedrich did not even hear of anything called renewal copyrights until 2005 or 2006.  Id.

71.     Thomas suggested at the initial meeting between Friedrich, Thomas and Lee that Friedrich use an artist named Mike Ploog to turn Friedrich's word pictures of the characters and story into cartoon form and Friedrich agreed, believing that Ploog would be the best choice because of the main character's supernatural aspects.  GF Decl. ¶ 51; GF Dep. 148:6-10; 172:10-13; RT Depo. 87:13-23.

72.     Ploog was a freelance artist (not an employee) that worked briefly with MMC prior to Spotlight No. 5.  Deposition of Mike Ploog ("Ploog Dep."), annexed to Kramer Decl. as Ex. 7, 16:5-17.

73.     Ploog was contacted to work on the project on a freelance basis and he agreed to take on that role.  GF Dep. 148:20-25.

74.      Friedrich met with Ploog and ensured that he received Friedrich's previously prepared synopsis detailing the story, the look of the characters, and the key panels that would need to be drawn.  GF Decl. ¶ 52, GF Dep. 81:14-17; Ploog Dep. pg. 99-100.

75.     Friedrich orally spoke with Ploog and gave him additional instructions.  GF Decl. ¶ 53; GF Dep. Pg. 173-175; Ploog Dep. 51:10-13, pg. 84-85.

76.     Ploog learned from Friedrich what the characters were to look like in specific detail, how they were to be drawn and what should be drawn in the key panels.  GF Decl. ¶ 53, see Ploog Dep. pg. 50-51, pg. 85-87, pg. 99-100; see GF Dep. 173-175.

77.     Ploog has acknowledged that he received a "brief" or "detailed sketch" on the characters and storyline and drew them off that brief, and has admitted that he would have have drawn them the way that he did without a detailed script.  Ploog Dep. 85:15-86:21; 95:8-10; 99:16-20; 100:3-9.

78.     Ghost Rider was fully developed before Ploog came on the scene.  Id. 83:12-13.

79.     Ploog thereafter converted Friedrich's vision of what the characters and key panels would look like into pictorial form, drawing them as he had been instructed to do so by Friedrich, pursuant to the written synopsis and oral instructions.  GF Decl. ¶ 54.

80.     Prior to beginning the actual story panels, Ploog prepared sample sketches of the key characters as described by Gary.  They were shown to Gary and he approved them saying that they "looked like what I had told Mike to draw."  GF Dep. 170:18-171:3.

81.     Ploog drew the characters under instruction.  Ploog Dep. 50:25.

82.     Ploog never did work at the Marvel offices of Magazine Management.  Ploog Dep. 36:22-25.

83.     The initial sketches by Ploog concerning Spotlight were done in New Jersey.  Ploog Dep.  60:3-7.

84.     Ploog does not recall having any conversations with Thomas after receiving the script from Friedrich.  Ploog Dep. 100:16-19.

85.     Defendants admit that Friedrich instructed Ploog on how Ghost Rider should look, and instructed Ploog on the other characters' general appearance.  Answers to Plaintiffs' Contention Interrogatories, Ex. 20, 21 and 22 to Kramer Decl., pg. 5.

86.     Sometime in or around August, 1971, Friedrich left his mailroom staff position and he and his wife moved back to Missouri as a result of a brutal murder and rape upstairs from Friedrich's apartment building.  GF Decl. ¶ 55.

87.     After moving to Missouri, Friedrich continued to work on and supervise his comic book project that would result in Spotlight No. 5.  GF Decl. ¶ 56.

88.     When it came time to design the cover for Spotlight No. 5, Friedrich described what the cover page for Spotlight No. 5 should look like with Ploog.  Ploog drew up a sketch and Friedrich approved that sketch.  GF Decl. ¶ 57.

89.     Spotlight 5 was published and distributed by Magazine Management with a "credits box" to the book's inside splash page  which  noted that Spotlight 5 had been "conceived and written by" Friedrich.  Marvel Spotlight, No. 5, annexed to Kramer Decl, as Ex. 8.

90.     Thomas saw the credits in the credit box before Spotlight 5 was published and did not argue with the credit.  RT Depo. 55:11-56:13.

91.      Thomas acknowledges that Friedrich was the major creator of Spotlight 5 and that it was entirely his idea.  Ex. 8 to Kramer Decl., Spotlight 5, Ex. 35 to Kramer Decl., February 22, 2010 e-mail to Boal, RT 00213; Ex. 34 to Kramer, Decl., email from Thomas to Friedrich, May 31, 2006, GF000250;

92.      Thomas merely added a credit for himself, indicating he had aided and abetted Friedrich which Friedrich approved.  RT Dep. 55-56.

93.     Friedrich approved such a credit to recognize Thomas' role in setting up the meeting with Lee.  GF Decl. ¶ 59.

94.      Thomas openly admits that the use of the conceived by credit was unusual.  RT Dep. 56:15-19.

95.     Thomas recognized that such a credit acknowledging that Friedrich had created the material on his own, without being asked to, and not in connection with any existing title he'd been assigned to work on, was at a minimum, rare, and could not recall another time such a credit was given.  RT Dep. Pg. 57-58.

96.     Marvel Defendant's longtime attorney and corporate representative, John Turitzin, testified in a binding corporate representative deposition that he, and thus Marvel Characters, Inc., Marvel Entertainment, LLC, and Marvel Studios, Inc., ("Marvel Defendants") were unaware of any other comic book using the "conceived" language.  Deposition of John Turitzin ("JT Dep."), annexed to Kramer Decl. as Ex. 8, 8:23-9:14, 59:21-25.

97.     Ploog also agreed that he did not think he had ever seen a conceived by credit given.  Ploog Dep. Pg. 77-78.

98.     Stan Lee specifically acknowledges that, unlike the other MMC characters and title lines, he had no role in creating Spotlight 5 or Ghost Rider, and that it was created by Friedrich.  Lee dep. 14:1-25.

99.     Lee saw the credit given to Friedrich and did not argue.  GF Decl. ¶ 60.

100.    Lee is on record saying that people should only get such credit when they deserve it.  See "An Afternoon with Stan Lee", attached to the Kramer Decl. as Ex. 17, MVL 0013340-0013370.

101.    Friedrich proofread Spotlight 5 for final approval before it was published.  Friedrich Affidavit ¶ 61; RT Dep. 351:11-18.

102.    Thomas himself has acknowledged that he is not sure if he even proofread Spotlight 5.  RT Dep. 351:11-18.

103.    In or around April, 1972, Spotlight 5 was published by Magazine Management Co, Inc and put on newsstands.  Ex. 8, Marvel Spotlight No. 5.

104.    Spotlight 5 was published and distributed it with the credit to Friedrich for having conceived and written Spotlight 5.  GF Decl. ¶ 62.

105.    Spotlight 5 was created at the suggestion, instigation and request of Friedrich, and by turning the previously created characters and origin story and related characters into comic book dialogue and pictures.  Id.

106.    Friedrich's creation of the Ghost Rider characters and Spotlight 5 was not within the scope of any employment with any company.  Id. ¶ 63.

107.    Friedrich did not have comic book writing responsibilities as part of his position as a mail clerk with Magazine Management or as part of any staff position with Magazine Management or any "Marvel" company.  Id. ¶ 64.

108.    While working with Magazine Management, Friedrich was not required to accept any assignment to write any comic books. Id. ¶ 65.

109.    Nothing in Friedrich's employment with Magazine Management required him to provide Magazine Management with the opportunity to publish comic books featuring original characters and stories created by Friedrich on his own time and without any request from Magazine Management and Friedrich was NEVER asked to create a central character around which a comic book would revolve around.  Id. ¶ 63, 65.

110.    The fact that Friedrich periodically agreed to write comic books for Magazine management on an as requested, free lance basis, did not require Friedrich to provide Magazine Management with the opportunity to publish comic books featuring original characters and stories created by Friedrich on his own time and without any request from Magazine Management.  Id. ¶ 67.

111.    The Spotlight 5 project and the conversion of the Ghost Rider Characters and story into a comic book was not undertaken as part of any request from Magazine

Management and was not specially ordered or commissioned by Magazine Management, but rather was Friedrich's idea. Id. ¶ 66.

112.     At the time of Spotlight 5, Friedrich had no written agreement with Magazine Management in any respect. Id. ¶ 67; JT Dep. 30.

113.     The expense of Friedrich's direction of Ploog to implement Friedrich's previously conceived comic book panel illustrations was borne by Friedrich (including the calls to Ploog, the time spent proof reading and editing of the book, and oversight of the project), as were Friedrich's mail expenses of sending materials back and forth from Missouri. Id. ¶ 68.

114.     Cadence Industries, a claimed successor in interest to Magazine Management, published and distributed a comic book containing a complete reprint of Spotlight 5 in or around February 1974. Marvel Spotlight #5 reprint, Ex. 26 to Kramer Decl.

115.     When Cadence Industries published the comic book containing the reprint of Spotlight 5 in 1974, the "credits box" was altered to reflect the fact that Stan Lee had not actually played a role as editor, the location of the credit to Friedrich within the credit box was changed, but the acknowledgment that Friedrich had conceived the comic book was not disputed, and was exclaimed. Id.

116.     Spotlight 5 was also reprinted by Defendant Marvel Entertainment Inc. in or around July of 1992 and again acknowledged the credit of Friedrich. Ex. 44 to Kramer Decl., 1992 Reprint of Spotlight 5.

117.     In late spring/early summer 1972, Spotlight 5 hit the newsstand at the same time Issue 111 of Spiderman and other comics that were published by MMC were also being distributed. RT Dep. 62:10-15; Ex. 23 to Kramer Decl., Amazing Spiderman, #111.

118.    The issue of Spiderman out at the time, and several others comic books included a copy of a feature called the "Marvel Bullpen Bulletins" through which MMC spoke to its fans. RT Dep. 40:9-16.

119.    The particular Bullpen in the comics distributed at the same time as Spotlight 5 was written by Roy Thomas or Stan Lee.  RT Dep. 38:15-39:5; 41:19-42:16.

120.    Through the Bullpen article, Magazine Management announced Spotlight 5 was then also on newsstands and discussed the new Ghost Rider characters.  RT Dep. 40:9-16.

121.    In that article, MMC specifically announced that Spotlight 5 was on sale and that Friedrich had "dreamed the whole thing up."  Ex. 23 to Kramer Decl., Amazing Spiderman #111.

122.    The Bullpen was an official statement from MMC, and went through the editorial process to make sure it was accurate.  RT Dep. 76:12-77:1.

123.    Marvel's associate editor at the time, Roy Thomas, acknowledges Friedrich could have taken the Ghost Rider characters and story to another company if he desired.  RT Dep. 74-75.

124.    The entire expense of the creation of the Ghost Rider origin story line and the creation and development of the Ghost Rider characters was borne by Friedrich in the years prior to his approaching MMC. GF Decl. ¶ 41.

125.    Friedrich paid for the materials to write out the written synopsis.  GF Decl. ¶ 42.

126.    Friedrich received no payment for the time it took to write out the synopsis. GF Decl. ¶ 43.

127.    Friedrich received no payments for the development of the ideas, the storyline or the characters.  GF Decl. ¶ 44.

128.     On or about February 21, 2007, Friedrich applied to the United States Copyright Office for a Renewal Copyright Registration in his name for Spotlight 5. Ex. 39, attached to Kramer Decl.

129.     The United States Copyright Office undertook an investigation into whether or not Friedrich was the sole author of Spotlight 5, including the role of Mike Ploog. Ex. 41, attached to Kramer Decl., correspondence with Copyright Office.

130.     A Copyright Certificate of Registration was issued on February 26, 2007 in the name of Gary Friedrich. Ex. 37, attached to Kramer Decl.

131.     Thereafter, on or about March 29, 2007, Friedrich assigned any and all rights he may have to Spotlight 5 to Gary Friedrich Enterprises, LLC. Ex. 27, to Kramer Decl.

132.     The Assignment Agreement embodies the assignment, and the same was registered with the United States Copyright Office. Ex. 27 attached to Kramer Decl.

133.     Friedrich was not aware of any discussions or announcements concerning a potential movie concerning Spotlight 5 until sometime in 2004, after which he contacted an attorney. GF Decl. ¶ 70.

134.     Friedrich was not aware of any toys, video games or other related merchandise being produced until around the time the movie was going to be released, in late 2006 and early 2007. GF Decl. ¶ 71.

135.     Friedrich stated in May 2001 that if "Marvel" ever got in a position to make a movie using his Ghost Rider characters, he would sue. Ex. 42 annexed to Kramer Decl, Comic Book Artist #13 (May 2001), pg. 75.

136.      Friedrich filed a Complaint in this matter on April 4, 2007 asserting, inter alia, that ownership of the copyright to Spotlight 5 vested to Friedrich in 2001.  See Docket No. 3 filed in Southern District of Illinois in 3:07-cv-00230.

137.      As early as August 20, 2002, Marvel (and Sony/Columbia) was put on notice that Spotlight 5 had never been registered and that Friedrich could have potential claims to the copyrights.  Ex. 31 annexed to Kramer Decl. MVL0015716-0015730; JT Dep. 82:23-87:25.

138.      On October 13, 2003, Sony expressed concern over the ownership rights of Spotlight 5, and requested agreements for both Ploog and Friedrich.  Ex. 30 annexed to Kramer Decl., MVL15712-15713.

139.      Marvel acknowledged that it had no agreements with Friedrich prior to 1978, and that it was not in possession of checks paid to Ploog.  Ex. 29 to Kramer Decl.  MVL 00014236-00014245.

140.      Friedrich obtained the services of an attorney in 2004, and that attorney sent a letter dated April 6, 2004 to Jared Jussim at Sony Pictures.  Ex. 32 to Kramer Decl.  SPE 11072-11074.

141.      Thereafter, correspondence was exchanged between Friedrich's attorney and Marvel whereby Marvel sought more information and conducted an internal investigation.  Correspondence attached as Ex. 40 to Kramer Decl.

142.      Marvel did not deny Friedrich's claim until Eli Bard's letter of June 17, 2004, in which he stated that "Marvel is the author of the works for copyright purposes."  Ex. 33 to Kramer Decl., MVL 14229-14230.

143.      The Marvel Defendants have admitted they were aware of Friedrich's claims as early as 2004.  JT Dep. 138:25-139:5, 140:12-18.

144.     After being put on notice of Friedrich's claims, the Marvel Defendants changed nothing with regard to their business practices and handling of the Ghost Rider characters and story.  Id. 139:15-140:9.

145.     After being put on notice of Friedrich's claims, the Marvel Defendants did not stop publication of the comic book.  Id.

146.     After being put on notice of Friedrich's claims, the Marvel Defendants did not stop from entering into any licensing agreements concerning the works.  Id.

147.     The Marvel Defendants cannot identify any witnesses that they have been unable to call as a result of any alleged delay.  Id. 141:19-142:5.

Dated:  October 17, 2011                    Respectfully submitted,


                                            By:___/s/ Charles S. Kramer_____
                                            RIEZMAN BERGER, P.C.
                                            Charles S. Kramer, Esq.
                                            Joseph D. Schneider, Esq.
                                            7700 Bonhomme, 7th Floor
                                            St. Louis, Missouri 63105
                                            T:  314.727.0101
                                            F:  314.727.6458


                                            ROTH EVANS, P.C.
                                            Eric Evans, Esq.
                                            Dawn Kamadulski O'Leary, Esq.
                                            2421 Corporate Centre Drive
                                            Suite 200
                                            Granite City, IL  62040
                                            T:  618.931.5000
                                            F:  618.931.6474


                                            SIMON•LESSER PC
                                            Leonard F. Lesser, Esq.
                                            420 Lexington Avenue
                                            New York, New York 10170
                                            T:  212.599.5455
                                            F:  212.599.5459

                                            Attorneys for Plaintiffs Gary Friedrich
                                            Enterprises, LLC and Gary Friedrich


## CERTIFICATE OF SERVICE

        I hereby certify that the above pleading was filed electronically with the Clerk of the
Court using the CM/ECF system this _____ day of October, 2011, which will send
notification to all those entitled to receive such notice.


                                            _____/s/ Charles S. Kramer_____