```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
GARY FRIEDRICH ENTERPRISES, LLC,       :
et al.,                                :
                                       :      08 Civ. 1533 (KBF)(JCF)
                        Plaintiffs,    :
                                       :        MEMORANDUM OPINION
            -v-                        :            & ORDER
                                       :
MARVEL ENTERPRISES, INC., et al.,      :
                                       :
                        Defendants.    :
                                       :
-------------------------------------- X
```

KATHERINE B. FORREST, District Judge:

    The Ghost Rider has been an iconic character for several decades. He has appeared in numerous comic books, movies, video games, toys and other specialty items. The first phase of the instant lawsuit, commenced in 2007 by plaintiffs Gary Friedrich Enterprises, LLC and Gary Friedrich ("Friedrich," and collectively with the LLC, "Plaintiffs"), comes down to one determinative question: do Plaintiffs own any rights in the Ghost Rider character (the "Character") and/or, what is referred to in the comic book and character industry as the Character's "origin story" (which first appeared in a volume of Marvel Comics called "Spotlight 5" and referred to herein by that name or the "Work")? If Plaintiffs own any rights--either as sole or as a joint author of the Character and Work--then Plaintiffs'

claims against Marvel[1] for copyright infringement could result in a damages award.[2]  After several years of litigation, including substantial document productions and numerous depositions, both sides have now moved for summary judgment on the question of ownership.

   A substantial amount of effort throughout the litigation and the majority of the briefing on these dueling motions relates to the question of whether Friedrich created the Ghost Rider character and the Work as a "work for hire."  If so, then Plaintiffs effectively agree that all rights passed to Marvel.  See Pls.' & Counterclaim-Defs.' Mem. In Supp. of Mot. for Summ. J. (Dkt. No. 312) at 3-4.  If, on the other hand, the Character and Work were not created as works for hire, then at the expiration of the original copyright term (conceded by both sides to be 2001), the renewal rights to both the Character and the Work reverted to Plaintiffs.  If that were the case, Marvel would have no remaining property rights in either the Character or the Work.

---

[1] "Marvel" is used herein to refer to defendants Marvel Entertainment, Inc., formerly known and sued in this action as Marvel Enterprises, Inc., Marvel Studios, Inc., Marvel Characters, Inc., Marvel Characters B.V., Marvel Worldwide, Inc. formerly known as Marvel Publishing, Inc., Marvel International Character Holdings, LLC, sued herein as Marvel International Holdings, Inc. and MVL International C.V. as well as the predecessors-in-interest of those companies, including but not limited to Marvel Entertainment Group, Inc., Cadence Industries Corporation and Magazine Management Co., Inc.

[2] The Court dismissed all Plaintiffs' other claims under state law and the Lanham Act upon adoption of Magistrate Judge Francis' Report and Recommendation.  See Dkt. No. 34.

For the reasons set forth below, the Court finds that it is unnecessary to reach the question of whether or not the Character and Work were created as works for hire: all of the briefing--and what would certainly amount to triable issues of fact on those questions--are irrelevant to the determination of the instant motions. This Court finds that there were at least two moments in time when Friedrich definitively conveyed by contract to Marvel all rights of whatever nature, including any renewal rights to the Character and the Work: (1) at the time of payment for the initial creation of the Character and Work in 1971 and 1972; and (2) in a separate contract signed in 1978 by Friedrich and Marvel Comics Group, a division of Cadence Industries Corporation (and defined therein as "Marvel") (the "1978 Agreement").[3] There is no triable issue of fact as to whether (a) in 1971, Friedrich conveyed any rights he may have had to both the Character and the Work to Marvel and (b) in 1978, he again conveyed to Marvel any rights he then had or could have in the future in the Character and the Work. Either one of those contractual transfers would be sufficient to resolve the question of ownership. Together, they provide redundancy to the answer that leaves no doubt as to its correctness.

---

[3] At the time Friedrich and Marvel Comics entered into the 1978 Agreement, the term "Marvel" referred to, <u>inter alia</u>, Marvel Entertainment Group (a predecessor-in-interest to defendant Marvel Entertainment, Inc.).

Accordingly, Defendants' motion for summary judgment is GRANTED and Plaintiffs' motion for summary judgment is DENIED.

BACKGROUND:  THE GHOST RIDER RIDES AGAIN[4]

While the parties agree on very little, the evidence in the record is clear that in 1971 Friedrich worked on, and in April of 1972 the Marvel Comics Group division of Magazine Management Co., Inc. ("MMC," a predecessor-in-interest to defendant Marvel Characters B.V.) subsequently published, "Marvel Spotlight, Vol. 1, No. 5."  Defs.' Stmt. Of Undisputed Facts ("Defs. Stmt.") (Dkt. No. 306) ¶ 33; Pls.' Stmt. Of Undisputed Facts ("Pls. Stmt.") (Dkt. No. 311) ¶ 103.  Spotlight 5 introduced a newly created Ghost Rider character.  By all accounts, the Ghost Rider in Spotlight 5 differed significantly from another, earlier Marvel Comics character by the same name.  The Ghost Rider of the 1950's and early 1960's was a "Western" character who rode a horse and was apparently mortal in all respects.  Defs. Stmt. ¶ 5; <u>see also</u>  Pls.' Resp. to Defs. Stmt. (Dkt. No. 325) ¶ 5.  The 1972 Spotlight 5 publication introduced readers to a new, motorcycle-riding Ghost Rider whose head was skeletal and at times had fire blazing from it.  Defs. Stmt. ¶ 6; <u>cf. id.</u> ¶ 60; Pls. Stmt. ¶ 34.  The new Ghost Rider had superhero characteristics and was somewhat mystical.  A supporting cast of characters, including Johnny Blaze (the Ghost Rider's alter

---

[4] The below recitation of facts are undisputed unless otherwise indicated.

ego), Roxanne Simpson, and Crash Simpson, were also first introduced in Spotlight 5.  Cf. Pls. Stmt. ¶¶ 59, 111.

There is also no dispute that Friedrich conceived and wrote the text of the first Spotlight 5 comic book that introduced the new Ghost Rider and the supporting cast.  The parties do not dispute that on the first publication of Spotlight 5 in April 1972, the "credits box" inside the book's "splash page" stated that the Work was "conceived and written by" Friedrich.  Pls. Stmt. ¶ 89; see also Defs. Resp. to Pls. Stmt. (Dkt. No. 329) ¶ 89.  The Work also bore a copyright notice in the name of "Magazine Management Co., Inc., Marvel Comics Group."  Defs. Stmt. ¶ 34; see also Pls. Resp. to Defs. Stmt. ¶ 34.  In spring and summer of 1972, MMC published Issue III of Spiderman and other comics that contained a feature called "Marvel Bullpen Bulletin" (i.e., an article within comic books through which MMC "spoke to its fans") which told readers to look out for Spotlight 5 because it would introduce the new Ghost Rider character.  Pls. Stmt. ¶ 118; see also Defs. Resp. to Pls. Stmt. ¶ 118.  The Bullpen article attributed the Character to Friedrich, stating that he had "dreamed the whole thing up."  Pls. Stmt. ¶ 121; see also Defs. Resp. to Pls. Stmt. ¶ 121.

It is also undisputed that Friedrich never raised an issue regarding Marvel's exploitation of the Ghost Rider character and the creation of numerous subsequent episodes until sometime in

5

or after 2004. Defs. Stmt. ¶ 68; see also Pls. Resp. to Defs. Stmt. ¶ 68. It is undisputed that Friedrich only wrote several episodes of the Ghost Rider, but that others also wrote Ghost Rider episodes, even while Friedrich continued to write as a freelance comic book writer for Marvel. Defs. Stmt. ¶ 42; see also Pls. Resp. to Defs. Stmt. ¶ 42.

There is extensive testimony in the record and recited in the briefs regarding the general process Marvel used to create comic books. Plaintiffs agree that Marvel employed a process to create comic books called the "Marvel Method," but state that there were a variety of methods to which that moniker was attributed. Pls. Resp. to Defs. Stmt. ¶¶ 8-9; see also Defs. Stmt. ¶ 8. As discussed below, Plaintiffs, however, dispute only one (irrelevant) step in the Marvel Method used to create the Work. As discussed below, it is useful for this Court to understand the characteristics of the Marvel Method used in the context of creating the Work when it interprets the 1978 Agreement.

The parties disagree as to whether the first step of what would typically have initiated the Marvel Method was followed here--i.e., assignment or independent development of a synopsis of a character or work. Defs. Stmt. ¶ 10; see also Pls. Resp. to Defs. Stmt. ¶ 10. Frankly, that step is not relevant here. From that point forward, Plaintiffs agree with the description

6

of the Marvel Method. In addition to the first step, the typical method involved (2) an artist (not the writer) illustrating a work based on the synopsis, (3) providing the illustrated panels to the writer for text to be written (for the Ghost Rider episode in Spotlight 5, there is no disagreement that plaintiff was the writer), (4) a "letterer" placing the text in the appropriate spot on the illustration (sometimes in consultation with the writer), (5) an "inker" applying color, and (6) finally, printing and distribution of the comic book. See Defs. Stmt. ¶ 8. All of that occurred on a schedule set by an editor employed by Marvel. Cf. id. ¶ 17. It is undisputed that the Marvel Method steps 2-6, and the schedule on which this was all done, occurred in the case of Spotlight 5. Defs. Stmt. ¶¶ 9, 13, 15, 17-19.

It is also undisputed that all of the individuals who performed the tasks involved in steps 2-6, as well as the cost of publication and distribution, were paid for by Marvel. Defs. Stmt. ¶¶ 20, 22. No other participants in Spotlight 5 other than Friedrich and Marvel, has raised a claim of ownership with respect to the Character or Work.

It is undisputed that Friedrich had been both an employee and freelance comic book writer for Marvel for a period of time preceding and then following the publication of Spotlight 5. See Friedrich Dep. at 16:13-16:19; 47:13-47:22. In connection

7

with his work as an employee, Friedrich was paid with a payroll check, Friedrich Dep. at 111:3-10; for his freelance work, he and other freelancers, were paid separately by check, Pls. Stmt. ¶ 21. When freelancers were paid by separate check, there would be a legend on the back of the check that, as described by Friedrich at his deposition, "said something about by signing over the check I gave over my rights to Magazine Management, Marvel, whoever." Friedrich Dep. at 142:9-142:15; see also Defs. Stmt. ¶ 78. Friedrich conceded that the checks he received during the time period in which he created the Character and the Work contained the assignment legend. Friedrich Dep. at 142:25-143:5. Friedrich also admitted that there were legends on the back of his freelance checks and that he signed the checks. Friedrich Dep. at 180:23-181:8. It is undisputed that Friedrich was paid as a freelancer in the ordinary course for his work on Spotlight 5: the record evidence is that freelance work was paid for with separate checks containing that legend, Pls. Stmt. ¶ 21--and there is no evidence in the record that the freelance checks he received for the Work varied from typical practice and did not contain the legend.

Friedrich testified at his deposition that when he discussed the Ghost Rider idea with the two senior editorial employees, Roy Thomas and Stan Lee, he understood that Marvel

8

would own the rights to the Character and the Work for comic books--but, without any articulation on his part, let alone acknowledgment on the part of Marvel management, he asserts that he assumed that he would personally retain rights to exploit the Character and the Work in other, non-comic mediums.  Friedrich Dep. at 77:14-77:23; 79:9-79:22.  At the time, he was considering the possibility of a television show, but there is no evidence in the record that raises any issue of fact that he discussed this or obtained any agreement from Marvel that even television rights would be left out of the bundle of rights that Marvel would own.  See Friedrich Dep. at 108:11-108:23.

At some point, Friedrich, who had been residing in New York City, moved to Missouri.  Friedrich Dep. at 42:4-42:25.  However, he continued to write freelance comics for Marvel.  See Friedrich Dep. at 43:6-22.  It is undisputed that in 1978, Friedrich signed the 1978 Agreement, the consideration for which was the possibility of future freelance work.  Defs. Stmt. ¶ 46; Pls. Resp. to Defs. Stmt. ¶ 46; see also Friedrich Dep. at 101:5-101:8.  Friedrich concedes that he had read the 1978 Agreement when he signed it, that he discussed it with other freelancers--in particular, the topic of relinquishing rights which they may have had in exchange for the possibility of additional work--and that he understood its import.  Friedrich Dep. at 101:15-101:16, 105:3-105:21.  Friedrich also testified

9

that following execution of the 1978 Agreement, he essentially disappeared for a year--he was an alcoholic and was riding in a truck with a friend for a period of time. Friedrich Dep. at 44:4-44:13. There is no evidence in the record that Friedrich was therefore able to be located for freelance work from Marvel after signing the 1978 Agreement, or that he sought such work.

Sometime between 2000 and 2001, Friedrich became aware of additional exploitations of the Ghost Rider character. He consulted two sets of counsel, the first represented him in or around April 2004 in connection with asserting rights that would have provided him a financial participation in the first of what are now about to be two Ghost Rider feature films. Defs. Stmt. ¶ 67; see also Pls. Resp. to Defs. Stmt. ¶ 67. After counsel was unsuccessful in obtaining Plaintiffs participation rights, there was a several year hiatus in Plaintiffs' pursuit of legal action. During that period, Defendants continued an uninterrupted active exploitation of Ghost Rider--including release of the Ghost Rider film and licensing associated in toy and promotional products. Defs. Stmt. ¶¶ 49-50, 52, 66.

In 2007, Plaintiffs retained current counsel and this lawsuit followed on April 4 of that year.

Plaintiffs' remaining claims assert copyright infringement: (i) against Marvel for ownership of the renewal rights in the Character and the Work; (ii) arising from unauthorized creation

and profiting from the Ghost Rider film (against Marvel and the "Movie Defendants"[5]); and (iii) for unauthorized use of the Work and Character in the creation of toys, video games and other products against Marvel and defendants Hasbro, Inc. and Take-Two Interactive Software, Inc.  As stated above, the parties cross-moved for summary judgment on the question of ownership.  The resolution of ownership in Defendants' favor necessarily resolves the infringement claims relating to the Ghost Rider movie, video games, toys and promotional products.

## DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  In making that determination, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor."  Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the

---

[5] The Movie Defendants are Columbia Pictures Industries, Inc. (also sued in this action as Columbia Tri-Star Motion Picture Group), Crystal Sky, LLC, Michael De Luca Productions, Inc., Relativity Media, LLC, and Sony Pictures Entertainment Inc.

non-movant's claims cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot "rely merely on allegations or denials" contained in the pleadings. Fed. R. Civ. P. 56(e); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over material facts--"facts that might affect the outcome of the suit under the governing law"--will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

    The law is clear that when an individual endorses a check subject to a condition, he accepts that condition. See Archie Comic Pubs., Inc. v. DeCarlo, 258 F. Supp. 2d 315, 331 (S.D.N.Y. 2003) (finding that an endorsement on a check assigning "all right, title and interest" to the comic book publisher by the artist assigned all rights, including copyrights, to the

12

publisher).  See also In re Flax, 179 B.R. 408, 412 (Bankr. E.D.N.Y. 1995) (a legend on a certified check requiring endorsement for payment "made it clear that the checks' payment would be conditioned on obtaining the proper endorsement"). As a result of that straightforward legal proposition, it is unnecessary for this Court (or a jury) to travel down the rabbit hole of whether the Character and Work were in fact originally created separate and apart from Marvel, whether they are a "work for hire," or whether during an initial conversation in which Friedrich obtained consent to proceed with the project that eventually became the Work, he had thoughts about what rights he might want to retain.[6]  There is no triable issue of fact that Friedrich was paid in any manner other than the routine and typical manner in which he was paid for his other freelance work--and that this would have included a check with a legend of assignment that became operative upon endorsement.  As a result, if Friedrich (and thus, Plaintiffs) had any rights to the Character or the Work at the time he endorsed the checks (a question we need not resolve), he relinquished those rights to Marvel.  See Archie Comic Pubs., Inc., 258 F. Supp. 2d at 331 (finding that an endorsement on a check that assigned "right, title and interest in and to the strip, copy, art, continuity,

---

[6]  Regardless, Friedrich conceded at his deposition that he did not articulate his thoughts about any retained rights during the initial conversation about the Character.  Friedrich Dep. at 108:11-108:23.

13

characters, story or manuscript entitled or used in" the story "support[ed] the view that ACP [i.e., the publisher] was the sole owner of all rights").

The law surrounding renewal rights, and what is required to convey renewal rights, can be complicated. That complexity is enhanced by the fact that the 1909 and 1976 Copyright Acts deal with renewal rights in slightly different ways. It is uncontested that the Character and Work were "published" (as that term of art is used in the copyright laws) in 1972. This Court has previously determined that the 1976 Act applies to the Character and the Work. See Dkt. No. 28 ("although the instant case involves copyrighted material and noncopyrightable intellectual property created during the late 1960s and early 1970s . . ., the 1976 Act controls"); see also Dkt. No. 34 (adopting Dkt. No. 28). Regardless of whether the 1909 or 1976 Act applies, the law is clear that the presumption against the conveyance of renewal rights may be overcome "where the author includes language which expressly grants rights in renewals of copyright or extensions of copyright." P.C. Films Corp. v. MGM/UA Home Video Inc., 138 F.3d 453, 457 (2d Cir. 1998). Language in a contract that includes "'general words of assignment can include renewal rights,'" including words such as "forever," "hereafter," and "perpetual" effectively convey

14

renewal rights.  Id. (quoting Siegel v. Nat'l Periodical Pubs., Inc., 508 F.2d 909, 913 (2d Cir. 1974)).

The language of the 1978 Agreement could not be clearer:

> "SUPPLIER [i.e., Friedrich] expressly grants to MARVEL forever all rights of any kind and nature in and to the Work, the rights to use SUPPLIER's name in connection therewith and agrees that MARVEL is the sole and exclusive copyright proprietor thereof having all rights of ownership therein." (emphasis supplied).

By this assignment, in 1978 Friedrich undoubtedly conveyed whatever renewal rights he may have retained, if any.  See, e.g., P.C. Films Corp., 138 F.3d at 457.

Plaintiffs have raised a series of arguments as to why the 1978 Agreement should be ignored.  None have merit.

Plaintiffs argue that the language of the 1978 Agreement has to be read to refer only to works that "SUPPLIER" (here, Friedrich) "prepared or performed" "for the Marvel Comics Group."  Plaintiffs focus on the word "for" as if it necessarily means that the works encompassed by the 1978 Agreement would have to be works for hire, and that if they were not "for" Marvel, and thus not works for hire, then the 1978 Agreement has no force and effect.  Pls.' & Counterclaim-Defs.' Mem. In Opp'n to Defs. Mot. for Summ. J. (Dkt. No. 322) at 21-22 ("Pls. Opp'n"); see also id. at 21 n.17.  That reading, however, would render the contract a nullity always.  If it was only to cover works that Marvel already unambiguously owned, then there would

15

be no need to enter into the agreement at all.  The law provides that contracts should not be interpreted in a way that suggests that the drafters were irrational or that would render them a nullity ab initio.  See, e.g., LaSalle Bank Nat'l Assn. v. Nomura Asset Capital Corp., 424 F.3d 195, 206 (2d Cir. 2005); Legal Aid Soc'y v. City of New York, 114 F. Supp. 2d 204, 229 (S.D.N.Y. 2000) ("[B]asic principles of contract interpretation militate against the adoption of an interpretation that would render any portion of the contract language a nullity.").[7]

In any event, it is clear from the undisputed facts regarding the Marvel Method, however, that there were at least six steps relating to the development of the Character and the Work that only occurred once the project had been approved.  The illustrator created the drawings of the character and the storyline, Friedrich as writer then wrote the text that the letterer placed in the correct portion of the drawing--all of this was then inked, published and distributed.  Throughout this process, the typical practice was for Friedrich to have been paid on an ongoing basis, and there is no evidence in the record that he was not.  Thus, Friedrich both endorsed over any rights he had in the Character and Work upon deposit of the checks bearing the assignment legend, but there were also a sufficient

---

[7] Plaintiffs concede that New York law applies to the 1978 Agreement.  See Pls. Opp'n at 23.

16

number of involved steps in the creation and finalization of the project that it would be illogical to suggest that since Marvel was paying for all of it, it was not at that point "for" them.

Plaintiffs also argue that the 1978 Agreement is an unenforceable contract of adhesion. Pls. Opp'n at 23-24. The law does not support that assertion. Friedrich was not required to sign the contract--he could have declined and sought work with some other comic book company. Indeed, he had been employed by other companies in the past. See, e.g., Friedrich Dep. at 13:4-13:7, 16:11-16:14, 32:17-33:7. There is nothing in the record to suggest that the only possible entity for whom he could have freelanced was Marvel. See, e.g., Anonymous v. JPMorgan Chase & Co., No. 05 Civ. 2442, 2005 WL 2861589, at *6 (S.D.N.Y. Oct. 31, 2005) (a contract was not unconscionable "particularly when the plaintiff had the ability to go to other sources . . .").

Plaintiffs also argue that the contract lacked consideration because Friedrich never in fact received any additional freelance work from Marvel. Pls. Opp'n at 22-23. However, there is evidence in the record that Friedrich was effectively unavailable following execution of the contract for reasons that had nothing to do with Marvel and everything to do with his personal circumstances. In any event, the law is clear that unless there was fraud involved at the outset, the fact

that a promise of future work does not materialize does not eliminate that promise as sufficient consideration to support a contractual bargain--*i.e.*, it is well settled that an exchange of promises is sufficient to satisfy the legal requirement of consideration.  <u>See</u> Restatement (Second) of Contracts §§ 17, 71, 75 (2011); <u>see also</u> <u>id.</u> § 79 ("If the requirement of consideration is met, there is no additional requirement of . . . mutuality of obligation.").[8]

As a result, this Court finds that there is no triable issue of fact regarding whether the 1978 Agreement conveyed whatever rights Plaintiffs may have had at that time or would have acquired in the future, including renewal rights.  <u>See, e.g.</u>, <u>P.C. Films Corp.</u>, 138 F.3d at 457.

For the reasons set forth above, this Court need not reach the issues of whether the Character and Work were works for hire, or whether Plaintiffs at one time had rights as a joint author.  Both conveyances in the endorsed checks and the contractual endorsement that occurred in the 1978 Agreement effectively ended any remaining ownership claims Plaintiffs might have had.

---

[8] Plaintiffs further attempt to obscure the clarity of the assignment in the 1978 Agreement by arguing that the agreement was between Friedrich and Cadence Industries Corporation, and that the Work was created "pursuant to an agreement with Magazine Management."  Pls. Opp'n at 21.  The undisputed facts show that Friedrich understood that "Marvel Comics Group" as defined in the 1978 Agreement referred to Magazine Management.  <u>See</u> Friedrich Dep. at 31:9-31:19.

CONCLUSION

Defendants' October 17, 2011 motion for summary judgment is GRANTED. Plaintiffs' October 17, 2011 motion for summary judgment is DENIED.[9] The claim of ownership over the Character and the Work (Count I) is resolved in Defendants' favor, which necessarily disposes of Plaintiffs' claims for infringement relating to (i) the use of the Character in movies by Marvel and the Movie Defendants (Count II); and (ii) the use of the Character with respect to toys and video games (Count III). Accordingly, Plaintiffs' remaining claims in the First Amended Complaint, filed March 28, 2011 (Dkt. No. 95-2)--Counts I, II and III--are dismissed.

The conduct of further proceedings in this action shall be governed by an order issued separately with this Memorandum Opinion.

The Clerk of Court is directed to terminate the motions (Dkt. No. 304 and 307).

SO ORDERED:

Dated:   New York, New York
         December 28, 2011

*Katherine B. Forrest*

KATHERINE B. FORREST
United States District Judge

---

[9] The Court is not aware of any caselaw, and Plaintiffs cite to none, in support of Plaintiffs' argument that Marvel's mirror copyright counterclaim is barred by the applicable statute of limitations.

19