12-893-cv
*Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*

N.Y.S.D. Case #
08-cv-1533(KBF)

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

---

August Term 2012

(Argued: February 20, 2013    Decided: June 11, 2013)

Docket No. 12-893-cv

---

GARY FRIEDRICH ENTERPRISES, LLC, and
GARY FRIEDRICH,

**USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:** June 11, 2013

*Plaintiffs-
Counter-Defendants-
Appellants,*

v.

MARVEL CHARACTERS, INC., a Delaware corporation,

*Defendant-
Counter-Claimant-
Appellee,*

MARVEL ENTERPRISES, INCORPORATED, a Delaware corporation, MARVEL ENTERTAINMENT, INCORPORATED, a Delaware corporation, MARVEL STUDIOS, INC., a Delaware corporation, HASBRO, INC., a Rhode Island corporation, TAKE TWO INTERACTIVE SOFTWARE, INC., a Delaware corporation, COLUMBIA TRI-STAR MOTION PICTURE GROUP, a joint venture, COLUMBIA PICTURES INDUSTRIES, INC., a Delaware corporation, CRYSTAL SKY PICTURES, a California corporation, RELATIVITY MEDIA L.L.C., a California corporation, MICHAEL DE LUCA PRODUCTIONS, INC., a California corporation, SONY PICTURES ENTERTAINMENT, INC., MARVEL CHARACTERS B.V., MARVEL INTERNATIONAL CHARACTER HOLDINGS, INC., MARVEL WORLDWIDE, INC.,

*Defendants-Appellees,*

CERTIFIED COPY ISSUED ON 06/11/2013

3 DAY BLINDS, AAGLOBAL INDUSTRIES, ABDO PUBLISHING, ADORABLE KIDS, ART.COM INC., ARTIMONDE TRADING INC., ASGARD PRESS, AST SPORTWEAR INC., BECKER AND MAYER LLC, BERKSHIRE FASHIONS, BEST BRANDS CONSUMER PRODUCTS INC., BIODOME, BOWEN DESIGNS, BROWN SHOES, BUSTER BROWN & CO., BUY RITE DESIGNS, CALEGO INTERNATIONAL, CDVISIONARY, CLICKS WORLDWIDE, CORBIS CORPORATION, COMIC IMAGES, CONOPCO INC., d/b/a UNILEVER, d/b/a UNILEVER CANADA, INC., CSS INDUSTRIES, DCL MOTION PICTURES LLC, COURAGE BRANDS INC., DCL MOTION PICTURES, LLC, DESPERATE ENTERPRISES, INC., DIAMOND SELECT TOYS AND COLLECTIBLES LLC, DORIS KINDERSLY LTD., EVERY PICTURES TELLS A STORY, FANTASY FLIGHT GAMES, FUNLINE MERCHANDISE, GAMER GRAPHICS, GELASKINS, GENTLE GIANT LTD., GRAPHICS IMAGING, HANDS-ON MOBILE AMERICA INC., HEWLETT PACKARD, HOT TOPIC, INC., HUGH, LAUTER, LEVIN AND ASSOCIATES, JAGO CORP. ASIA LIMITED, JAKKS PACIFIC, INC., JASMAN ASIA LTD., JAY FRANCO & SONS, INC., JPI ACQUISITION GROUP, d/b/a DISGUISE INC., JOHNNY BLAZE SPORTSWEAR, K2, INC., KELLYTOY (USA), KLUTZ, KOTOBUKIYA, KHQ INVESTMENT LLC, KDT USA, KSM SUPERHERO LTD., KSM ENTERPRISE INC., LASERMARCH INC., LEAP YEAR PUBLISHING, LF USA INC., LOWRIDER TECHNOLOGY GROUP, INC., MAD ENGINE INC., MAISTO INTERNATIONAL INC., MASTER REPLICAS INC., MATTEL INC., MATTEL EUROPA, MATTEL ASIA PACIFICA, MATTEL OVERSEAS, MEREDITH CORPORATION, MCA INC., MGA ENTERTAINMENT, INC., MFORMA AMERICAS INC., MFORMA HOLDINGS, LTD., MEDICOM, MIGHTY FINE, INC., MOB TOWN, MONOGRAM INTERNATIONAL, MZ BERGER AND COMPANY, NECA INC., NATIONAL ENTERTAINMENT COLLECTIBLES ASSOCIATION INC., NMTC, d/b/a MATCO TOOLS, INC., NR2B RESEARCH, INC., NTD APPAREL, NUBYTECH, PHOTO FILE, INC., PLANETWIDE GAMES, POP CULTURE GRAPHICS, INC., R AND INTERNATIONAL, RAVEN SOFTWARE, RC2 CORPORATION, RITTENHOUSE ARCHIVE, LTD., SARA LEE CORPORATION, d/b/a KLUTZ, SCREENLIFE LLC, SEGA CORPORATION, SEGA OF AMERICA, INC., SIDESHOW COLLECTIBLES, INC., SOTA TOYS LLC, SPENCER REED ACCESSORIES LTD., SPIN MASTER LTD., STREET FLYERS, STRETCH-O-RAMA, INC., SWICHERZ LLC, THQ INC., TM INTERNATIONAL, d/b/a SAAVI, d/b/a VSI, UPPER DECK COMPANY, TOY ISLAND MANUFACTURING COMPANY, LTD., TOY THINGS, TRENDS INTERNATIONAL LLC, TRI-COASTAL DESIGN, TUPPERWARE BRANDS CORPORATION, US NUTRITION INC., ULTIMATE LICENSING GROUP LLC, UNION UNDERWEAR COMPANY, INC., d/b/a FRUIT OF THE LOOM, UNIVERSAL

CITY, UNIVERSAL DESIGNS, LTD., VETEMENT ADORABLE TOO, WAGERLOGIC
LIMITED, WALGREEN COMPANY, WEAR ME APPAREL CORP., WHAT KIDS WANT
INTERNATIONAL, WHAT KIDS WANT, INC., WILTON BRANDS, INC., WILTON
INDUSTRIES INC., WIZ KIDS LLC, YELLOWMAN LLC, YORK WALLCOVERINGS,
INC., ZAZZLE, INC., ZIZZLE HOLDING LIMITED, MVL INTERNATIONAL
C.V., MARVEL ENTERTAINMENT, LLC, ACTIVISION BLIZZARD, INC.,
SCHOLASTIC, INC., DCL MOTION PRODUCTS, WALT DISNEY COMPANY,

*Defendants.*

---

Before:
        WINTER, CHIN, AND DRONEY, *Circuit Judges*.

---

Appeal from a judgment of the United States
District Court for the Southern District of New York
(Forrest, *J.*), dismissing the amended complaint for
copyright infringement brought by the purported creator of
the comic book character Ghost Rider, and awarding damages
to the publishing company on its counterclaim for copyright
infringement.  The district court held as a matter of law
that plaintiff-counter-defendant-appellant Gary Friedrich
assigned any rights he retained in the renewal term of the
1972 Ghost Rider copyrights to the predecessor of
defendant-counter-claimant-appellee Marvel Characters, Inc.
in a 1978 form work-for-hire contract.  We conclude that

the contract language is ambiguous and that genuine
disputes of material fact, as to the parties' intent and
other issues, preclude the granting of judgment as a matter
of law.

     VACATED AND REMANDED.

---

     CHARLES S. KRAMER (Joseph D. Schneider, *on
     the brief*), Riezman Berger, P.C.,
     St. Louis, Missouri, *and* Eric W.
     Evans *and* Dawn K. O'Leary, Evans
     Blasi, Granite City, Illinois, *for
     Plaintiffs-Counter-Defendants-
     Appellants.*

     R. BRUCE RICH (Randi W. Singer, Gregory
     Silbert, *and* Adam B. Banks, *on the
     brief*), Weil, Gotshal & Manges LLP,
     New York, New York, *and* David
     Fleischer, Haynes and Boone, LLP,
     New York, New York, *for Defendant-
     Counter-Claimant-Appellee and
     Defendants-Appellees.*

---



CHIN, *Circuit Judge*:

In 1972, the Marvel Comics Group published a comic book featuring the "Ghost Rider" -- a motorcycle-riding superhero with supernatural powers and a flaming skull for a head. The issue -- which sold for twenty cents -- told the story of Johnny Blaze, a motorcycle stunt rider who promised his soul to the devil to save his adoptive father from cancer.

In this case, plaintiff-counter-defendant-appellant Gary Friedrich contends that he conceived the Ghost Rider, the related characters, and the origin story, and that he owns the renewal term copyrights in those works.  While acknowledging that Friedrich contributed his ideas, defendant-counter-claimant-appellee Marvel Characters, Inc. ("Marvel") contends that the Ghost Rider characters and story were created through a collaborative process with Marvel personnel and resources, and that Marvel owns the renewal rights in question.

The district court granted summary judgment in favor of Marvel on the ownership issue, holding that Friedrich had assigned any rights he had in the renewal term copyrights to Marvel when he executed a form work-for-hire agreement in 1978, six years after the initial publication of the issue in question.  Friedrich and his production company, Gary Friedrich Enterprises, LLC, appeal.  We vacate and remand for trial.

### STATEMENT OF THE CASE

**A.** *The Facts*

The facts are heavily disputed.  They are
presented here in the light most favorable to Friedrich,
with all reasonable inferences drawn in his favor.  *See
Garcia v. Hartford Police Dep't*, 706 F.3d 120, 126-27 (2d
Cir. 2013) (per curiam).  To the extent Friedrich argues
that he is entitled to summary judgment on the issue of
authorship, we construe the facts in Marvel's favor and set
forth that alternative version below.

**1.** *Friedrich Creates the Ghost Rider*

A fan of comic books and motorcycle gang movies,
Friedrich began to imagine, in the 1950s, a motorcycle-
riding superhero who wore black leather.  The hero
developed into a motorcycle stuntman when Evel Knievel rose
in popularity in the late-1960's.  Then in 1968, after
seeing his bony-faced and red-headed friend on a
motorcycle, Friedrich was inspired to give his hero a
flaming skull for a head.  This epiphany caused Friedrich
to flesh out an origin story in which his hero became a
demon after making a deal with the devil.

- 7 -

Friedrich was a part-time freelance comic book writer, scripting issues of existing comic book serials when solicited by Marvel[1] and other publishers. In 1971, Friedrich decided to try to publish a comic book starring his flaming-skulled hero after the Comics Code Authority relaxed its standards to permit comic books to contain more adult-themed and supernatural content. After refining the origin story and the characters' appearances, Friedrich created a written synopsis on his own initiative and at his own expense. The synopsis detailed Ghost Rider's origin story and the main characters' appearances.

## 2. *Marvel Agrees to Publish the Comic*

Friedrich presented his written synopsis to his friend Roy Thomas, an assistant editor at Magazine Management Co., Inc. ("Magazine Mgmt."), the then-publisher of Marvel comics.[2] Thomas liked the idea, so he gave the

---

[1] Ownership of the comic book brand "Marvel Comics Group" has changed hands multiple times over the years. For simplicity, the term "Marvel" will be used to refer generally to the publisher of the comics, and the specific corporate owner will be identified only when relevant.

[2] In 1968, Martin and Jean Goodman sold the Marvel Comics Group brand and their other publishing assets to Perfect Film & Chemical Corporation ("Perfect Film"). Perfect Film then

synopsis to Marvel chief Stan Lee and arranged for Lee to meet with Friedrich.  Lee agreed to publish the Ghost Rider comic book in the series *Marvel Spotlight*, a vehicle used to audition new superheroes.  In return, Friedrich agreed to assign his rights in the Ghost Rider characters to Marvel.  Friedrich and Lee never discussed renewal rights and did not execute a written agreement.

At Marvel's suggestion, Friedrich gave the synopsis to freelance artist Mike Ploog, who illustrated the comic book according to Friedrich's instructions. Friedrich supervised the entire production of the comic book, advising Ploog on how the characters should look and what to draw.

3.    *The Comic Is Published in 1972*

The first Ghost Rider comic was published in *Marvel Spotlight*, Vol. 1, No. 5 ("*Spotlight* 5") in April 1972, bearing a copyright notice in favor of "Magazine Management Co., Inc. Marvel Comics Group."  The first page

---

assigned the Marvel brand to its wholly-owned subsidiary Magazine Mgmt.

of the comic, reproduced above, contained a credit box that
included the following:

CONCEIVED & WRITTEN<br>
***GARY FRIEDRICH***

At the same time *Spotlight* 5 was published, Marvel
advertised the new superhero in a contemporaneous issue of
*The Amazing Spider-Man.* In a feature called "Marvel
Bullpen Bulletins," Marvel encouraged fans to read
*Spotlight* 5 and acknowledged that Friedrich had "dreamed
the whole thing up."

Ghost Rider quickly became one of Marvel's most
popular comic book heroes. After *Spotlight* 5, Ghost Rider
stories appeared in the next six issues of *Marvel
Spotlight*. By May 1973, Marvel launched a separate *Ghost
Rider* comic book series. Friedrich wrote the stories for
several of these later comics on a freelance basis and does
not dispute that these subsequent stories were "works made
for hire."[3] Marvel promptly filed registrations for several
of these subsequent Ghost Rider comic books, even though it

---

[3]     Friedrich only alleges authorship of the main
characters and origin story contained in *Spotlight* 5.

had not filed a registration for *Spotlight* 5.[4]  In October

1974, Marvel reprinted the original *Spotlight* 5 as *Ghost*

*Rider* Vol. 1, No. 10, leaving Friedrich's "Conceived &

Written" credit intact.

 The *Ghost Rider* comic book series ran, in

successive volumes, from 1973 to 1983, 1990 to 1998, and

2001 to 2002.  In total, Marvel published over 300 comic

book stories starring Ghost Rider and reprinted *Spotlight* 5

five times, including as late as 2005.  Marvel never

removed Friedrich's "Conceived & Written" credit from any

of the *Spotlight* 5 reprints.

 **4.** ***The Agreement***

 Friedrich continued to write Ghost Rider and other

superhero stories for Marvel on a freelance basis until

approximately 1978.  In 1976, Congress repealed the 1909

Copyright Act and replaced it with the current Copyright

Act.  *See* Pub. L. No. 94-553, 90 Stat. 2541 (1976)

(codified at 17 U.S.C. § 101 *et seq.*).  Under the 1976 Act,

which took effect on January 1, 1978, *id.* § 102 (codified

---

  [4] Marvel would not register *Spotlight* 5 until 2010,
after this action was filed.

at note preceding 17 U.S.C.), a work created outside the
scope of employment was considered a "work-for-hire" only
if the parties had executed an express written agreement to
that effect, *see* 17 U.S.C. § 101 (defining "work made for
hire").[5]  Thus, in 1978, Cadence Industries, Inc.
("Cadence"), the then-publisher of Marvel comics,[6] required
Friedrich and all of its other freelance artists to sign a
form work-for-hire agreement.

    The full agreement was a page long and read in
pertinent part:

> MARVEL is in the business of
> publishing comic and other magazines
> known as the Marvel Comics Group,
> and SUPPLIER wishes to have MARVEL
> order or commission either written
> material or art work as a
> contribution to the collective work
> known as the Marvel Comics Group.
> MARVEL has informed SUPPLIER that
> MARVEL only orders or commissions
> such written material or art work on
> an employee-for-hire basis.

---

[5]    The statute defines "work made for hire" as, *inter
alia*, "a work specially ordered or commissioned for use as a
contribution to a collective work . . . if the parties expressly
agree in a written instrument signed by them that the work shall
be considered a work made for hire."  17 U.S.C. § 101.

[6]    Magazine Mgmt. assigned the Marvel Comics Group brand
to Cadence, Perfect Film's successor, in 1972.

THEREFORE, the parties agree as
follows:

In consideration of MARVEL's
commissioning and ordering from
SUPPLIER written material or art
work and paying therefor, SUPPLIER
acknowledges, agrees and confirms
that any and all work, writing, art
work material or services (the
"Work") which have been or are in
the future created, prepared or
performed by SUPPLIER for the Marvel
Comics Group have been and will be
specially ordered or commissioned
for use as a contribution to a
collective work and that as such
Work was and is expressly agreed to
be considered a work made for hire.

SUPPLIER expressly grants to
MARVEL forever all rights of any
kind and nature in and to the Work,
the right to use SUPPLIER's name in
connection therewith and agrees that
MARVEL is the sole and exclusive
copyright proprietor thereof having
all rights of ownership therein.
SUPPLIER agrees not to contest
MARVEL's exclusive, complete and
unrestricted ownership in and to the
Work.

July 31, 1978 Agreement between Friedrich & Marvel (the

"Agreement").  Cadence told Friedrich that the Agreement

only covered future work and that he had to sign it without

alteration if he wanted to obtain further freelance work

from them.  Thus, Friedrich filled in his name and address by hand as the "Supplier" and signed the Agreement on July 31, 1978.  Friedrich was not paid anything for signing the Agreement.  After he signed, neither Cadence nor any subsequent Marvel publisher solicited any more freelance work from him.

     **5.**   ***The Renewal Term Beginning in 2001***

       The initial copyright term for Ghost Rider expired at the end of 2000, twenty-eight years after *Spotlight* 5's original publication in 1972.  *See* 17 U.S.C. § 304(a)(1)(A).  Beginning in 2001, the renewal copyright would have vested in Friedrich, as the original author, by operation of law.  *See id.* § 304(a)(1)(C)(i), (2)(B)(ii).  Nonetheless, Marvel exploited the Ghost Rider character after 2000 by:  publishing reprints of *Spotlight* 5 in 2001, 2004, and 2005; publishing six issues of a new *Ghost Rider* comic series that ran from August 2001 to January 2002; offering a single Ghost Rider toy for sale in catalogs in 2003 and 2004; having Ghost Rider make cameo appearances in other characters' video games released in 2000 and 2006; filming the *Ghost Rider* movie in 2005 and releasing it in

2007 (pursuant to a licensing agreement entered into in 2000); and releasing a *Ghost Rider* video game, based on the movie, in 2007.  While most of these items did not credit Friedrich, all the *Spotlight* 5 reprints published during the renewal term contained Friedrich's "Conceived & Written" credit.

Friedrich was not aware of Marvel's use of the Ghost Rider character during the renewal period until around 2004, when he learned Marvel was preparing to make the *Ghost Rider* movie.  On April 6, 2004, Friedrich's attorney wrote a letter to Sony Pictures, the company producing the movie, asserting Friedrich's rights to the Ghost Rider copyright.  In a response dated April 14, 2004, Marvel advised Friedrich that Ghost Rider was a work-for-hire.  Despite taking this position, however, Marvel paid Friedrich with checks labeled "roy," meaning "royalties," when it reprinted *Spotlight* 5 in 2005.

Friedrich first learned about the concept of renewal rights in 2005 or 2006.  He filed for, and received, a Renewal Copyright Registration in *Spotlight* 5

and Ghost Rider in February 2007.  He then assigned the rights to his company, Gary Friedrich Enterprises, LLC.

**B.  *Proceedings Below***

On April 4, 2007, plaintiffs filed a complaint in the Southern District of Illinois against the current owners of Marvel and their licensees, alleging copyright infringement and various state law claims.  The action was transferred to the Southern District of New York.  The district court (Jones, *J.*) dismissed plaintiffs' state law claims because they were either preempted by the Copyright Act or failed to state a claim for relief.  *See generally Gary Friedrich Enters., LLC v. Marvel Enters., Inc.*, 713 F. Supp. 2d 215 (S.D.N.Y. 2010).  The district court (Forrest, *J.*) thereafter denied Friedrich's motion for reconsideration, which sought to reinstate his state law accounting claim under federal law.[7]

On May 17, 2010, Marvel and the related defendants filed their answer, asserting that Ghost Rider was a "work-

---

[7]     Friedrich argues on appeal that the district court erred in dismissing his state law claims and denying the motion for reconsideration.  After an independent review of the record, we affirm the dismissal of the state law claims for substantially the reasons set out in the district court's orders.

- 16 -

for-hire."  On December 15, 2010, they amended their answer
to include a compulsory counterclaim for copyright
infringement.  Plaintiffs also amended their complaint in
March 2011 to add additional licensee defendants.

After discovery on the ownership issues, both
sides moved for summary judgment.  Plaintiffs argued that
Friedrich was the sole author, or at least a joint author,
as a matter of law.  Defendants argued primarily that
Friedrich's ownership claim was barred by the statute of
limitations, but alternatively that he had assigned his
renewal rights to Marvel in the Agreement.  The district
court concluded that genuine disputes of material fact
surrounded the authorship of the work, but it nonetheless
granted Marvel's motion and denied Friedrich's.  *See
generally Gary Friedrich Enters., LLC v. Marvel Enters.,
Inc.*, 837 F. Supp. 2d 337 (S.D.N.Y. 2011).  The court
reasoned that even if Friedrich were the sole author, by
executing the Agreement, he had conveyed all his remaining
rights in the work to Marvel "forever."  *See id.* at 344-45.[8]

----

[8]     The district court also noted that Friedrich was paid
for his work on *Spotlight* 5 with checks bearing legends

The district court reasoned that the term "forever" clearly
indicated the parties' intent to convey the renewal term to
Marvel. *See id*. at 344-46 (citing *P.C. Films Corp. v.
MGM/UA Home Video Inc.*, 138 F.3d 453, 457 (2d Cir. 1998)).

After the court issued its order, the parties
stipulated that Friedrich realized $17,000 in profits from
exploiting the Ghost Rider copyright. Defendants also
agreed to voluntarily dismiss their trademark counterclaims
without prejudice, pending this appeal. The district court
then entered final judgment dismissing all outstanding
claims, awarding damages to Marvel for Friedrich's
copyright infringement, and enjoining Friedrich from using
the Ghost Rider copyright. This appeal followed.

## DISCUSSION

On appeal, Friedrich argues that the district
court erred in granting Marvel's motion for summary
judgment because the Agreement did not convey the renewal

---

assigning, in general terms, all of his rights to Marvel. *See
Gary Friedrich Enters., LLC v. Marvel Enters., Inc.*, 837 F.
Supp. 2d 337, 343-44 (S.D.N.Y. 2011). But the record does not
reveal the exact language of these check legends and Marvel
concedes that only the Agreement contains language that could
have even arguably conveyed Friedrich's renewal rights.

rights in the 1972 Ghost Rider copyright.  While Marvel
argues that we may affirm on that basis, it primarily
argues that we should affirm on the alternative ground that
Friedrich's ownership claim is barred by the Copyright
Act's three-year statute of limitations.  Finally,
Friedrich asks us to reverse the district court's denial of
his cross-motion for summary judgment on the issue of
authorship, leaving only the issue of damages on remand.

We address each of the three arguments in turn.

**A.   *Renewal Rights***

We review *de novo* both the grant of summary
judgment and the district court's interpretation of the
Agreement.  *See Ment Bros. Iron Works Co. v. Interstate
Fire & Cas. Co.*, 702 F.3d 118, 120-21 (2d Cir. 2012);
*Mullins v. City of New York*, 653 F.3d 104, 113 (2d Cir.
2011).  In reviewing a grant of summary judgment, we must
construe the evidence in the light most favorable to the
non-moving party and draw all reasonable inferences in its
favor.  *See Mullins*, 653 F.3d at 113.

## 1. *Applicable Law*

For artistic works still in their initial term of copyright protection on January 1, 1978, the Copyright Act establishes two terms of protection:  an initial term of twenty-eight years from "the date [the copyright] was originally secured" and a renewal term of sixty-seven years.  17 U.S.C. § 304(a)(1)(A), (a)(1)(C).  The renewal term of a copyright is "not merely an extension of the original copyright term but a 'new estate . . . clear of all rights, interests or licenses granted under the original copyright.'"  *P.C. Films Corp.*, 138 F.3d at 456-57 (quoting *G. Ricordi & Co. v. Paramount Pictures, Inc.*, 189 F.2d 469, 471 (2d Cir. 1951)).  Its purpose is "to 'provide authors a second opportunity to obtain remuneration for their works'" and "'to renegotiate the terms of the grant once the value of the work has been tested.'"  *Id.* at 457 (alteration omitted) (quoting *Stewart v. Abend*, 495 U.S. 207, 217, 218-19 (1990)).

An author may assign his renewal rights during the copyright's initial term, but "there is a strong presumption against the conveyance of renewal rights."

*Corcovado Music Corp. v. Hollis Music, Inc.*, 981 F.2d 679, 684 (2d Cir. 1993). This presumption may be rebutted by an express assignment of "renewals of copyright" or "extensions of copyright," or by "general words of assignment," such as "forever," "hereafter," or "perpetual," if the parties' clear intent was to convey renewal rights. *P.C. Films Corp.*, 138 F.3d at 457 (quoting *Corcovado Music Corp.*, 981 F.2d at 684-85; *Siegel v. Nat'l Periodical Publ'ns., Inc.*, 508 F.2d 909, 913 (2d Cir. 1974)) (internal quotation marks omitted). In *Siegel*, we explained that words like "forever" may be indicative of an intent to convey renewal rights, but this "intent is to be determined by the trier of the facts." *Siegel*, 508 F.2d at 913.[9] In *P.C. Films Corp.*, we affirmed the district court's conclusion, reached after a bench trial, that the term "perpetual" indicated a clear intent to convey renewal rights. 138 F.3d at 454. There, the parties had agreed to

---

[9] This is not to suggest that summary judgment may never be granted when a contract contains only general words of assignment. Rather, it means that general phrases like "forever" are merely some evidence of the parties' intent to convey renewal rights. As always, summary judgment should be granted if the record as a whole demonstrates there is no genuine dispute regarding the parties' intent. *See* Fed. R. Civ. P. 56(a).

use the term "perpetual" after "months of negotiations
conducted by sophisticated and expert parties, each
represented by counsel." *Id.* at 455.  Furthermore, there
was undisputed testimony that the assignee would not have
entered the agreement "for less than a perpetual term and
that, in his understanding, the term 'perpetual' . . . was
not coterminous with the initial copyright term." *Id.* at
457.

    We construe the Agreement according to state law
principles of contract interpretation, even though the
subject matter of the Agreement concerns issues of federal
copyright law.  *See Kennedy v. Nat'l Juvenile Detention
Ass'n*, 187 F.3d 690, 694 (7th Cir. 1999); *P.C. Films Corp.
v. Turner Entm't Co.*, 954 F. Supp. 711, 714 n.6 (S.D.N.Y.
1997), *aff'd sub nom. P.C. Films Corp. v. MGM/UA Home Video
Inc.*, 138 F.3d 453 (2d Cir. 1998); 1 Melville B. Nimmer &
David Nimmer, Nimmer on Copyright § 1.01[B][3][a] (rev. ed.
Supp. 2013) ("[T]he vast bulk of copyright contractual
issues must be resolved under state law, given the silence
of the Copyright Act in addressing such issues as . . . how
to construe ambiguous contractual language . . . .").

Because the Agreement was made entirely in New York and

performance was complete upon execution, New York law

governs its construction. *See Brink's Ltd. v. S. African*

*Airways*, 93 F.3d 1022, 1030-31 (2d Cir. 1996); *P. S. & E.,*

*Inc. v. Selastomer Detroit, Inc.*, 470 F.2d 125, 127 (7th

Cir. 1972).[10]

"When interpreting a contract [under New York

law], the 'intention of the parties should control, and the

best evidence of intent is the contract itself.'" *Cont'l*

*Ins. Co. v. Atl. Cas. Ins. Co.*, 603 F.3d 169, 180 (2d Cir.

2010) (alterations omitted) (quoting *Hatalmud v. Spellings*,

505 F.3d 139, 146 (2d Cir. 2007)). At the outset, the

court must determine whether the language the parties have

chosen is ambiguous, *see Lockheed Martin Corp. v. Retail*

*Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011), after

giving all "words and phrases . . . their plain meaning,"

---

[10]    While this case was originally filed in the Southern
District of Illinois, we conclude that New York law would govern
the contract whether we applied Illinois's or New York's choice-
of-law rules. *See Van Dusen v. Barrack*, 376 U.S. 612, 639
(1964) (explaining that federal court sitting in diversity must
apply choice-of-law rules of state where action was originally
filed, even after a transfer for improper venue); *see also*
*Ferens v. John Deere Co.*, 494 U.S. 516, 531 (1990) (holding that
"transferor law should apply regardless of who makes the
§ 1404(a) motion").

*Olin Corp. v. Am. Home Assurance Co.*, 704 F.3d 89, 99 (2d
Cir. 2012) (quotation omitted).  Furthermore, we do not
consider particular phrases in isolation, but rather
interpret them in light of the parties' intent as
manifested by the contract as a whole.  *See JA Apparel
Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009).  The
language is unambiguous only if it "has 'a definite and
precise meaning, unattended by danger of misconception in
the purport of the contract itself, and concerning which
there is no reasonable basis for a difference of opinion.'"
*John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.*, 22
F.3d 458, 461 (2d Cir. 1994) (alteration omitted) (quoting
*Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274,
1277 (2d Cir. 1989)).  But if the terms "suggest more than
one meaning when viewed objectively by a reasonably
intelligent person who has examined the context of the
entire integrated agreement," then the agreement is
ambiguous and extrinsic evidence may be considered to
determine the parties' intent.  *Law Debenture Trust Co. of
N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir.
2010) (quotation omitted).

### 2.  *Application*

Applying the "strong presumption against the conveyance of renewal rights," *Corcovado Music Corp.*, 981 F.2d at 684, we conclude that the district court erred in holding as a matter of law that Friedrich had assigned his renewal rights to Marvel by signing the Agreement.  We reach this conclusion for the following reasons.

#### a.  *The Plain Language*

The Agreement is ambiguous on its face.  First, the critical sentence defining the "Work" covered by the Agreement is ungrammatical and awkwardly phrased:

> In consideration of MARVEL's
> commissioning and ordering from
> SUPPLIER written material or art
> work and paying therefor, SUPPLIER
> acknowledges, agrees and confirms
> that any and all work, writing, art
> work material or services (the
> "Work") which have been or are in
> the future created, prepared or
> performed by SUPPLIER for the Marvel
> Comics Group have been and will be
> specially ordered or commissioned
> for use as a contribution to a
> collective work and that as such
> Work was and is expressly agreed to
> be considered a work made for hire.

This opaque cluster of clauses is simply not clear and parsing through its dense provisions does little to elucidate its meaning.

Second, the language is ambiguous as to whether it covered a work published six years earlier. The introductory recitals indicate that the "SUPPLIER *wishes to have* MARVEL order or commission" work and that "MARVEL *only orders or commissions* such . . . work on an employee-for-hire basis." There is no explicit acknowledgement that the generic "SUPPLIER" ever performed work for Marvel previously, and certainly no specific mention of the Ghost Rider works. Marvel attempts to extract the phrase "all work . . . which have [sic] been . . . created, prepared or performed by SUPPLIER for the Marvel Comics Group" from the dense sentence quoted above, but the entire agreement suggests that this was a forward-looking contract only intended to cover work submitted after the Agreement was signed.[11] Read in this context, work that "have [sic] been . . . created" -- to the extent the phrase has a

---

[11]    Indeed, after reading the Agreement for the first time during a deposition, a Marvel representative concluded that the form contract appeared to only cover work created after the 1976 Act.

discernible meaning -- may refer to work that was in-progress when the Agreement was executed, even though Marvel may have commissioned that work, and the freelance artist may have begun working on it, before the Agreement was formally reduced to writing. *See, e.g.*, Agreement ("MARVEL has informed SUPPLIER that MARVEL only orders . . . work on an employee-for-hire basis. . . . SUPPLIER acknowledges, agrees and confirms that any and all work . . . have [sic] been and will be specially ordered or commissioned . . . [as] a work made for hire.").

Third, the language is ambiguous as to whether it conveys renewal rights. The contract contains no explicit reference to renewal rights and most of the language merely tracks the 1976 Act's definition of "work made for hire." *See* 17 U.S.C. § 101 (defining term as "a work specially ordered or commissioned for use as a contribution to a collective work . . . if the parties expressly agree in a written instrument signed by them"). If the contract only covers "work made for hire," Marvel would be the statutory author, *see id.* § 201(b); *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 743-44 (1989) (citing 1909 Copyright

Act § 62, 17 U.S.C. § 26 (repealed 1976)), and the
"SUPPLIER" would not have any renewal rights that could be
assigned to Marvel.

Finally, Marvel relies heavily on the provision
"grant[ing] to MARVEL *forever* all rights of any kind and
nature in and to the Work." *Cf. Siegel*, 508 F.2d at 913-
14. In context, however, for the reasons discussed above,
it is not clear whether this broad language applies to work
performed by Friedrich some six years earlier. The
broadness of the language would be of no help to Marvel if
the Agreement were intended to cover only future work.
Moreover, that sentence goes on to provide that "Marvel is
the sole and exclusive copyright proprietor thereof having
all rights of ownership therein," which again suggests
Marvel is the statutory author by virtue of the fact that
the work was "made for hire." Thus, the Agreement could
reasonably be construed as a form work-for-hire contract
having nothing to do with renewal rights. Accordingly, the
language by itself fails to overcome the "strong
presumption against the conveyance of renewal rights."
*Corcovado Music Corp.*, 981 F.2d at 684.

### b. *Extrinsic Evidence*

Because the Agreement is reasonably susceptible of more than one meaning, it is ambiguous and we next look to extrinsic evidence in the record to determine whether there is a genuine dispute regarding the parties' intent at the time of the Agreement. *See Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 51 (2d Cir. 2011).

Here, the record demonstrates that Cadence extended this same one-page, forward-looking form contract to all its freelance artists to ensure that commissioned work would be deemed a "work made for hire" under the new 1976 Copyright Act.  It did so shortly after the 1976 Act took effect on January 1, 1978.  *See* 17 U.S.C. § 101; *see also* Copyright Act of 1976 § 102, Pub. L. No. 94-553, 90 Stat. 2541 (codified at note preceding 17 U.S.C.) (noting effective date of 1976 Act was January 1, 1978); *Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc.*, 380 F.3d 624, 633-34 (2d Cir. 2004) (explaining that 1976 Act only governs whether a work "created on or after January 1, 1978" is a work-for-hire).

When Friedrich signed the Agreement, he was doing other
freelance work for Marvel and he believed the Agreement
would only cover future work because that was what Cadence
told him at the time.  He was not paid anything separately
for signing the Agreement.  Moreover, *Spotlight* 5 had been
published six years earlier by a different corporate entity
(Magazine Mgmt.) and had grown so popular that Marvel had
already reprinted it once and had launched a separate *Ghost
Rider* comic book series.  Given that context, it is
doubtful the parties intended to convey rights in the
valuable Ghost Rider copyright without explicitly
referencing it.  It is more likely that the Agreement only
covered ongoing or future work.  Hence, there is a genuine
dispute regarding the parties' intent for this form
contract to cover Ghost Rider.

Even if the parties intended the definition of
"Work" to extend to Ghost Rider, that alone would not mean
that they intended the Agreement to convey Friedrich's
remaining renewal rights in that work.  First, the
Agreement appears to create an "employee for hire"
relationship, but the Agreement could not render Ghost

- 30 -

Rider a "work made for hire" *ex post facto*, even if the
extrinsic evidence shows the parties had the intent to do
so.  The 1909 Act governs whether works created and
published before January 1, 1978 are "works made for hire,"
*see Martha Graham Sch.*, 380 F.3d at 633-34, and that Act
requires us to look to agency law and "the actual
relationship between the parties, rather than the language
of their agreements," in determining the authorship of the
work, *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 291-
92 (2d Cir. 2002).[12]  Thus, regardless of the parties'
intent in 1978, the evidence must prove Ghost Rider was
actually a "work made for hire" at the time of its

---

[12]    *Marvel Characters, Inc. v. Simon*, 310 F.3d 280 (2d
Cir. 2002), is instructive.  There, an artist had sued Marvel,
alleging he created the comic book character Captain America and
therefore owned the renewal copyright in that work.  *Id.* at 283.
To settle the action, the artist agreed to assign the renewal
rights to Marvel and stipulated that Captain America was a "work
for hire."  *Id.* at 283-84.  In 1999, the artist attempted to
exercise his statutory right to terminate the assignment of
renewal rights.  *Id.* at 284 (citing 17 U.S.C. § 304(c)).
Because the work was subject to the 1909 Act, we held that "an
agreement made subsequent to a work's creation which
retroactively deems it a 'work for hire' constitutes an
'agreement to the contrary' under § 304(c)(5) of the 1976 Act."
*Id.* at 292.  Thus, the settlement agreement did not preclude the
artist from proving that he actually was the author and had the
statutory right to terminate the assignment.  *Id.* at 292-93.

creation.  But the circumstances surrounding the creation of the work are genuinely in dispute.

Second, there is little extrinsic evidence to suggest that the parties actually intended to assign anything other than an initial term of copyright and much evidence to suggest that they did not.  *See P.C. Films Corp.,* 138 F.3d at 457 ("'[G]eneral words of assignment can include renewal rights *if the parties had so intended*.'" (emphasis added) (quoting *Siegel*, 508 F.2d at 913)). Friedrich was unrepresented by counsel, was told that the Agreement only covered future work, and did not learn about the concept of renewal rights until 2005.  There was no discussion about renewal rights when he signed the Agreement in 1978.  A jury could reasonably conclude that the parties never even considered renewal rights when they made this contract.  Accordingly, the district court erred in granting summary judgment based on the Agreement.

**B.   *Timeliness of Ownership Claims***

Because Marvel asserts that there is an alternative ground for affirming the district court's judgment, we next consider its argument that Friedrich's

- 32 -

claim is barred by the statute of limitations.  We may affirm the district court's order granting summary judgment "on any ground supported by the record, even if it is not one on which the district court relied."  *McElwee v. Cnty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012).

### 1.  *Applicable Law*

Under the Copyright Act, all civil actions, including claims of ownership, must be commenced "within three years after the claim accrued."  17 U.S.C § 507(b); *see Kwan v. Schlein*, 634 F.3d 224, 228 (2d Cir. 2011).  "An ownership claim accrues only once, when 'a reasonably diligent plaintiff would have been put on inquiry as to the existence of a right.'"  *Kwan*, 634 F.3d at 228 (quoting *Stone v. Williams*, 970 F.2d 1043, 1048 (2d Cir. 1992)).  If "the ownership claim is time-barred, and ownership is the dispositive issue, any attendant infringement claims must fail."  *Id.* at 230.

Although an alleged author is aware of his claim to ownership of the work "from the moment of its creation," *Merchant v. Levy*, 92 F.3d 51, 56 (2d Cir. 1996), the author does not need to bring suit until there has been an

"express repudiation" of that claim, *see Zuill v. Shanahan*, 80 F.3d 1366, 1370-71 (9th Cir. 1996). "[A]ny number of events can trigger the accrual of an ownership claim, including '[a]n express assertion of sole authorship or ownership.'" *Kwan*, 634 F.3d at 228 (quoting *Netzer v. Continuity Graphic Assocs., Inc.*, 963 F. Supp. 1308, 1315 (S.D.N.Y. 1997)); *see also Zuill*, 80 F.3d at 1369 ("[C]laims of co-ownership, as distinct from claims of infringement, accrue when plain and express repudiation of co-ownership is communicated to the claimant, and are barred three years from the time of repudiation."). For example, a claim can accrue: when a book is published without the alleged co-author's name on it, *see Kwan*, 634 F.3d at 229; when alleged co-authors are presented with a contract identifying the defendant as the "sole owner and copyright holder," *Zuill*, 80 F.3d at 1368; *see also Gaiman v. McFarlane*, 360 F.3d 644, 652 (7th Cir. 2004); or when alleged co-owners learn they are entitled to royalties that

they are not receiving, *see Merchant*, 92 F.3d at 53, 56; *Stone*, 970 F.2d at 1048.[13]

## 2. *Application*

Marvel is not entitled to summary judgment on its statute of limitations defense. Friedrich filed his complaint on April 4, 2007 and thus Marvel had to have repudiated Friedrich's claim to ownership of the renewal rights prior to April 4, 2004 for his claim to be untimely. We conclude the district court could not have granted summary judgment on this basis because there are genuine disputes of fact regarding whether and, if so, when Marvel: (a) publicly repudiated Friedrich's claim; (b) privately repudiated Friedrich's claim in its communications with him; and (c) implicitly repudiated Friedrich's claim by

---

[13] Friedrich argues that the statute of limitations merely restricts his recovery to damages suffered in the three years before filing. In *Stone v. Williams*, 970 F.2d 1043 (2d Cir. 1992), we permitted the illegitimate heir of a famous singer to seek royalties for the three years prior to filing even though she was charged with knowledge of her ownership claim well before that. *See id.* at 1051. We have subsequently made clear, however, that a stale ownership claim bars recovery for all subsequent infringement claims. *See Kwan v. Schlein*, 634 F.3d 224, 228 (2d Cir. 2011). *Stone* represents a narrow exception in those rare situations "where uncertainty surround[s] the relative's status as a member of the author's family." *Merchant v. Levy*, 92 F.3d 51, 56 (2d Cir. 1996).

conspicuously exploiting the copyright without paying royalties.

### a.  *Public Repudiation*

First, there is a genuine dispute whether Marvel publicly repudiated Friedrich's claim.  There is evidence that, over the years, Marvel repeatedly and publicly recognized that Friedrich created the work.  Marvel publicly credited Friedrich with "conceiv[ing]" *Spotlight* 5 each time it reprinted the original comic -- including as late as 2005.  When the comic was originally published in 1972, Marvel explained in a contemporaneous publication that Friedrich had "dreamed the whole thing up."  Moreover, Marvel did not register a copyright in *Spotlight* 5 or Ghost Rider before Friedrich filed this action, even though it had registered nearly all of its other characters and several later Ghost Rider stories.

Marvel argues that the copyright notice on *Spotlight* 5 declared that Marvel was the owner and publicly repudiated Friedrich's claim.  But in 1972, the notice would have only indicated that Marvel held the rights to the initial term of copyright.  It would not have

conclusively demonstrated that Marvel was the author or
otherwise had the right to register the renewal term.[14]
*See, e.g.*, *P.C. Films Corp.*, 138 F.3d at 456 (explaining
that agreement permitted alleged assignees to "register[]
the renewal copyright in the[ir] names . . . as co-
claimants [just] as [their predecessors] had done for the
original copyright registration").  At a minimum, there is
a genuine dispute regarding whether this notice publicly
repudiated Friedrich's claim of authorship, and thus his
claim to ownership of the renewal rights.

> **b.** *Private Repudiation*

Second, the record is unclear as to whether Marvel
privately repudiated Friedrich's claim in its
communications with Friedrich before April 4, 2004.
Although Marvel contends that it told Friedrich that it

---

[14]    Under the 1909 Act, copyright protection was not
renewed automatically.  *See* 3 Nimmer on Copyright § 9.05[A][1].
Only certain parties could file for renewal and formal renewal
was an "absolute condition" to continued copyright protection.
*Id.* § 9.05[A][1], [D][1][a].  While subsequent amendments made
it possible for the renewal rights in works published between
1964 and 1977 to vest without formal registration, *see* Copyright
Renewal Act of 1992, Pub. L. No. 102-307, 106 Stat. 264; 3
Nimmer on Copyright § 9.05[A][1]-[2], this historical fact
indicates that the name on the original 1972 copyright notice
was not necessarily a public repudiation of Friedrich's claim to
ownership of the renewal copyright.

considered Ghost Rider to be a "work made for hire" either
at the time of the comic book's creation or at the time he
executed the Agreement in 1978, the circumstances
surrounding those events are in dispute.  Only Marvel's
letter dated April 16, 2004 clearly communicates that
position to Friedrich.  Because Friedrich filed his
complaint less than three years later, his ownership claim
would be timely if that was the first time Marvel privately
repudiated his ownership claim.  Accordingly, there is a
genuine dispute as to when Marvel first told Friedrich that
it intended to take sole credit for Ghost Rider.

### c. *Implied Repudiation*

Finally, there is a genuine dispute as to whether
Marvel's exploitation of the Ghost Rider copyright during
the renewal term,[15] without paying royalties, implicitly
repudiated Friedrich's claim to ownership.  In *Merchant v.
Levy*, 92 F.3d 51 (2d Cir. 1996), and *Stone v. Williams*, 970
F.2d 1043 (2d Cir. 1992), the alleged co-owners were

---

[15]    Marvel's extensive exploitation of Ghost Rider during
the initial term is irrelevant, as it would be merely consistent
with Friedrich's claims that he is the author and assigned only
the initial copyright term to Marvel.

- 38 -

charged with notice of their ownership claim once they knew they were entitled to receive royalties, but the works in both those cases were hit songs regularly played on the radio.  *See Merchant*, 92 F.3d at 52-53, 56 ("Why Do Fools Fall in Love" by Frankie Lymon and the Teenagers);[16] *Stone*, 970 F.2d at 1046, 1048 (songs of Hank Williams).  In contrast, Marvel used the Ghost Rider copyright sparingly and in non-obvious ways between 2001 and 2004.  *Cf. Zuill*, 80 F.3d at 1370 (analogizing statute of limitations for ownership claims to doctrine of adverse possession, which requires an "express or implicit ouster" to put the owner on notice); 3 Am. Jur. 2d *Adverse Possession* § 62 (2d ed. supp. Feb. 2013) (explaining that "the possession of the adverse claimant must be open and notorious").  During the renewal period but before 2004, Marvel merely:  published six issues of a short-lived *Ghost Rider* comic book series from August 2001 to January 2002; advertised a single Ghost Rider toy in each of its 2003 and 2004 toy catalogs; and used Ghost Rider for a cameo appearance in a video game

---

[16]     In *Merchant*, the jury decided when the alleged co-owners should have been charged with knowledge of their claim. *See Merchant*, 92 F.3d at 56.

entitled *Spider-Man.* There is a genuine dispute as to
whether a reasonably diligent person would have been put on
notice by this activity.

Marvel points out that its agreement to license a
*Ghost Rider* movie had been highly publicized since 2000 and
argues that this implicitly repudiated Friedrich's
ownership of the renewal copyright. We conclude that there
are genuine disputes of fact regarding whether these news
reports repudiated Friedrich's claim.

First, it is unclear whether this conduct even
occurred during the renewal term. Because the copyright
appears to have been first secured in 1972, the renewal
term would not have vested in Friedrich until January 1,
2001. *See* 17 U.S.C. § 304(a)(2)(A)(i); 3 Nimmer on
Copyright § 9.05[C][2] (explaining that the initial term
for a work first published on March 12, 1969 would end
December 31, 1997 -- at the end of the twenty-eighth
year -- and the renewal term would vest on January 1,
1998). Marvel entered the license agreement on May 15,
2000, before the initial term expired. Therefore, news of

that agreement would not necessarily have repudiated Friedrich's ownership of the renewal term.

Second, it was not clear that Marvel would refuse to pay royalties to Friedrich when the movie was released. According to *Merchant* and *Stone*, an ownership claim is triggered by knowledge of an entitlement to royalties that are not being paid, rather than by mere knowledge of the exploitation. *See Merchant*, 92 F.3d at 53, 56; *Stone*, 970 F.2d at 1048. Of course, in many cases, these two will go hand-in-hand. For example, a co-owner is aware of his claim of co-ownership from the moment the work is created, *see Merchant*, 92 F.3d at 56, and thus learning that another joint author is exploiting the work is sufficient notice that royalties are due. Here, however, Friedrich alleges primarily that he is sole author and alternatively that he is a joint author.

As to his claim of sole authorship, Friedrich would not have a right to royalties with respect to the movie, but a claim for damages. But as explained above, it is not clear that entering the agreement infringed Friedrich's ownership rights as it may have occurred during

the initial term.  With respect to the alternative co-
authorship claim, it is unclear whether the agreement
entitled Friedrich to any royalties before the movie was
released and began generating profits in 2007.  Moreover,
there is evidence that Marvel did pay Friedrich royalties
when it reprinted *Spotlight* 5 in 2005, suggesting that
Marvel also might pay him royalties when the movie was
released.  Hence, a jury could find that a reasonably
diligent person would not have known that Marvel was
exploiting Ghost Rider, without paying royalties, during
the renewal term but before April 4, 2004.  Because there
are genuine disputes regarding whether Friedrich should
have known about Marvel's repudiation of his claim of
ownership, his claim is not untimely as a matter of law.[17]

---

[17]    We also reject Marvel's arguments that Friedrich is
barred by the doctrines of laches, *see New Era Publ'ns Int'l,
ApS v. Henry Holt & Co.,* 873 F.2d 576, 584-85 (2d Cir. 1989),
and equitable estoppel, *see Veltri v. Bldg. Serv. 32B-J Pension
Fund*, 393 F.3d 318, 326 (2d Cir. 2004).  Marvel has not suffered
any "prejudice," *New Era Publ'ns*, 873 F.2d at 584, or
"injustice," *Veltri*, 393 F.3d at 326, warranting the invocation
of these equitable remedies.  The loss of evidence and the
deterioration of key witnesses' memories are the products of the
twenty-eight year initial copyright term and the parties' joint
failure to properly document the ownership of the Ghost Rider
copyright at the time of its creation.  Furthermore, Marvel was
on notice of a competing claim to the Ghost Rider renewal

C.    *Authorship and Work-for-Hire*

        On appeal, Friedrich also asks us to review the

district court's decision to deny his cross-motion for

summary judgment on the issue of authorship.  Friedrich

contends that the record establishes as a matter of law

that he was the author, or at least a joint author, of the

Ghost Rider work.

        Because we have jurisdiction over the grant of

summary judgment, we have the discretion to review the

otherwise unappealable order denying Friedrich's cross-

motion for summary judgment.  *See Barhold v. Rodriguez*, 863

F.2d 233, 237 (2d Cir. 1988).  Although we have already

decided to vacate the judgment in favor of Marvel, we

exercise our discretion to review this portion of the

district court's order in the interests of judicial

economy.  *See id.*  As with the grant of summary judgment,

we review the district court's denial *de novo*, but this

time we construe the record in favor of Marvel, "the party

_____

copyright since at least 2004 and chose to proceed with the
production and release of two *Ghost Rider* movies, including one
produced entirely after this lawsuit was filed.

against whom summary judgment is sought." *Mullins*, 653
F.3d at 113 (quotation omitted).

### 1. *Applicable Law*

The Copyright Act protects "original works of
authorship fixed in any tangible medium of expression," but
not ideas. 17 U.S.C. § 102; *see* H.R. Rep. No. 94-1476, at
57 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5670
(indicating 1976 Act did not change "the basic dichotomy
between expression and idea" embodied in the 1909 Act).
The author of a work owns the copyright in that work,[18]
unless it was a "work made for hire," in which case "the
employer or other person for whom the work was prepared is
considered the author for purposes of this title." 17
U.S.C. § 201(a), (b); *see also Cmty. for Creative Non-
Violence*, 490 U.S. at 743-44 (citing 1909 Copyright Act
§ 62).

Although the 1976 Act requires the parties to
execute an express agreement that a work is "made for

---

[18] If the work is a "joint work," that is "a work
prepared by two or more authors with the intention that their
contributions be merged into inseparable or interdependent parts
of a unitary whole," then the authors are co-owners of the
copyright. 17 U.S.C. §§ 101, 201(a).

hire," *see* 17 U.S.C. § 101, works created prior to 1978 are governed by the 1909 Copyright Act, *Martha Graham Sch.*, 380 F.3d at 633-34. That Act did not require an express agreement; instead, "[t]he copyright belong[ed] to the person at whose 'instance and expense' the work was created." *Id.* at 634-35. "A work is made at the hiring party's 'instance and expense' when the employer induces the creation of the work and has the right to direct and supervise the manner in which the work is carried out," even if that right is never exercised. *Id.* at 635.

   2.  *Application*

     We agree with the district court that there are genuine disputes of material fact that preclude granting summary judgment on the issue of authorship. While Friedrich points to evidence that would demonstrate that he was the sole author or a joint author of the work, Marvel has presented evidence supporting the following contradictory account of the creation of Ghost Rider:

     Marvel had published comic books starring a cowboy named Ghost Rider since 1966. In 1971, Friedrich was working on an issue of *Daredevil* when he approached Thomas

with an idea, not a written proposal, for a motorcycle-riding villain named Ghost Rider.  Thomas thought the character was better suited as a superhero in his own comic book and arranged a meeting with Lee.  Lee authorized the comic book, deciding Ghost Rider's alter ego would be named "Johnny Blaze," even though both Friedrich and Thomas disliked that name.  Friedrich began writing Ghost Rider's origin story only after this meeting.  Thomas and Ploog scheduled a meeting to design the character, but Friedrich failed to attend that meeting and did not provide any instruction on what Ghost Rider should look like beforehand.  Therefore, Ploog modeled the new character after the original cowboy, incorporating Thomas's idea for an Elvis-like leather jump suit and a skull head, and then spontaneously drawing flames to frame the skull.  The rest of the book was produced according to the "Marvel method," with Marvel retaining editorial control throughout and paying all costs, including a page rate for Friedrich's contributions as a freelance writer.

When construed in Marvel's favor, the record reveals that Friedrich had nothing more than an

- 46 -

uncopyrightable idea for a motorcycle-riding character when
he presented it to Marvel because he had not yet fixed the
idea into a tangible medium.  *See* 17 U.S.C. § 102(b).  A
jury could find that Marvel then "induce[d] the creation
of" the flaming-skulled superhero Ghost Rider and *Spotlight*
5, and had "the right to direct and supervise the manner in
which the work [was] carried out." *Martha Graham Sch.*, 380
F.3d at 635.  Under this version of the facts, Thomas, a
Marvel employee, was the one who decided that Ghost Rider
should be a superhero in his own comic book.  Lee, the head
of Marvel, commissioned the work by authorizing the comic's
production.  Ghost Rider's appearance and origin story
developed through the collaborative efforts of Friedrich,
Thomas, Lee, and Ploog, all of whom were paid by Marvel.
If accepted as true, a jury could easily conclude from
these facts that Ghost Rider was a "work made for hire" and
thus that Marvel was the sole statutory author.
Accordingly, we affirm the district court's denial of
Friedrich's motion for summary judgment.

### *CONCLUSION*

We conclude that the district court erred in granting summary judgment because the Agreement is ambiguous and there are genuine disputes of material fact regarding the parties' intent to assign renewal rights in that Agreement, the timeliness of Friedrich's ownership claim, and the authorship of the work.  Accordingly, the judgment is VACATED and the case is REMANDED for trial.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

8 -